

1

2

3

4

5

6

7

8              **UNITED STATES DISTRICT COURT**

9              **SOUTHERN DISTRICT OF CALIFORNIA**

10

11  MARKETQUEST GROUP, INC.,                CASE NO. 11-CV-618 JLS (WMC)

12                           Plaintiff,     **ORDER: (1) DENYING**
        vs.                                 **PLAINTIFF'S MOTION FOR**
13                                          **PRELIMINARY INJUNCTION; (2)**
                                            **DENYING DEFENDANTS'**
14  BIC CORPORATION; BIC USA, INC.;         **MOTION TO STRIKE**
    NORWOOD PROMOTIONAL PRODUCTS,
15  LLC; et al.,                            (ECF Nos. 27, 40)

16                          Defendants.

17

18          Presently before the Court is Plaintiff Marketquest Group, Inc.'s (Marketquest) motion for a

19  preliminary injunction.  (ECF No. 27.)  Also before the Court are Defendants BIC Corp., BIC USA,

20  and Norwood Promotional Products' (BIC) opposition (ECF No. 33), Marketquest's reply (ECF No.

21  35), and BIC's motion to strike (ECF No. 40).  The motion hearing set for November 10, 2011, is

22  **HEREBY VACATED**, and the matter is taken under submission without oral argument pursuant to

23  Civil Local Rule 7.1(d)(1).  Having considered the parties' arguments and the law, the Court **DENIES**

24  Marketquest's motion for a preliminary injunction and **DENIES** BIC's motion to strike.

25                                    **BACKGROUND**

26          Plaintiff Marketquest is a California corporation engaged in the production, advertising, and

27  sale of customizable promotional products, including writing instruments such as pens, using the

28  //

registered trademarks "ALL-IN-ONE" and "THE WRITE CHOICE." (FAC ¶ 10-12.)[1] According to Marketquest, in late 2010 Defendant BIC, comprised of Connecticut and Delaware corporations, began advertising and selling products, including pens and related products and services, using marks similar to Marketquest's. (FAC ¶ 21-25.) Specifically, BIC began using the phrase "The Write Pen Choice" in an online advertising campaign for writing instruments, including pens, in or around October, 2010. (FAC ¶ 23.) BIC also began advertising customizable promotional products, including pens, in 2011 Catalogues using the phrase "All in ONE." (FAC ¶ 24.)

By way of relevant background, in 2009 Defendant BIC USA acquired what became Defendant Norwood Promotional Products, LLC, a competitor in the promotional products business. (Def.'s Opp'n 2.) Norwood has its own trademark registrations for the NORWOOD mark and logo/design.[2] (Id.) In late 2010, BIC printed a number of NORWOOD catalogues for 2011, one of

---

[1] Marketquest lists five separate registered trademarks (four for the "ALL-IN-ONE" mark, and one for "THE WRITE CHOICE" mark; collectively, "the Infringing Marks"):

1. The mark "ALL-IN-ONE," registered in connection with its sale of products including "writing instruments, namely pens, pencils, markers, highlighting markers." Registration No. 2,422,967 (registered Jan. 23, 2001). (FAC ¶ 13, Ex. A.)

2. The mark "ALL-IN-ONE-LINE," registered in connection with its sale of products including "writing instruments, namely pens, pencils, markers." Registration No. 2,426,417 (registered Feb. 6, 2001). (FAC ¶ 14, Ex. B.)

3. The mark "ALL-IN-ONE stylized design," registered in connection with its sale of products and services including "writing instruments, namely pens, pencils, markers, highlighting markers" and "dissemination of advertising matter." Registration No. 3,153,089 (registered Oct. 10, 2006). (FAC ¶ 15, Ex. C.)

4. The mark "THE WRITE CHOICE," registered in connection with its sale of products including "writing instruments, namely pens, pencils, markers, highlighting markers." Registration No. 3,164,707 (registered Oct. 31, 2006). (FAC ¶ 16, Ex. D.)

5. The mark "ALL-IN-ONE stylized design," registered in connection with its sale of services including "customized imprinting of equipment, merchandise and accessories for business promotion." Registration No. 3,718,333 (registered Dec. 1, 2009). (FAC ¶ 17, Ex. E.)

[2] BIC lists two relevant registered trademarks:

1. The mark "NORWOOD," registered in connection with "preparation of custom advertisements and custom promotional products for others," Registration No. 2,894,578 (registered Oct. 14, 2004). (Def.'s Opp'n 2.)

2. The mark "NORWOOD logo/design," registered in connection with "custom imprinting for others of company name, trade name, logo or other copy, namely, words, phrases, and

which was the "NORWOOD All in ONE" catalogue, which "consolidated all of Norwood's available hard goods products in one catalogue." (Def.'s Opp'n 3.) As of the date of BIC's opposition to this motion, on October 3, 2011, BIC claims that this "NORWOOD All in ONE" catalogue is no longer in print and is no longer being distributed. (*Id.*) "Norwood will be changing the name of its NORWOOD Catalogue for 2012 and will no longer use the phrase 'All in ONE.'" (*Id.* at 4.)

On March 28, 2011, Marketquest filed this action for trademark infringement and unfair competition against BIC. (ECF No. 1.) On May 5, 2011, Marketquest filed the operative First Amended Complaint. (ECF No. 14.) Marketquest alleges what are essentially three causes of action: (1) trademark infringement under 15 U.S.C. § 1114(1) of its ALL-IN-ONE mark (Count I) and its THE WRITE CHOICE mark (Count III); (2) unfair competition under 15 U.S.C. § 1125(a) for its ALL-IN-ONE mark (Count II) and its THE WRITE CHOICE mark (Count IV); and (3) unfair competition in violation of Cal. Bus. & Prof. Code § 17200 (Count V). Marketquest requests a preliminary and permanent injunction to enjoin BIC from using the Infringing Marks in any manner, to order BIC to remove any products bearing the Infringing Marks from sale or display, and to order BIC to deliver any such goods to the Court for destruction. (FAC 8-10.) Marketquest claims BIC's use of the Infringing Marks is likely to confuse consumers, causing irreparable injury. (FAC ¶ 28-34.) On August 26, 2011, Marketquest moved for a preliminary injunction. (ECF No. 27.)

## LEGAL STANDARD

A preliminary injunction is an equitable remedy aimed at preserving the status quo and at preventing the occurrence of irreparable harm during the course of litigation. *See* Fed. R. Civ. P. 65. The Ninth Circuit has recently modified its preliminary injunction analysis in response to the Supreme Court's rejection of its previous standard. Now, it is clear that "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*

--------

decorative designs on promotional products, namely, promotional merchandise, apparel, and corporate gifts; custom printing for others of company name, trade name, logo or other copy, namely, words, phrases, decorative designs on advertising matter," Registration No. 3,575,173 (registered Feb. 17, 2009). (Def.'s Opp'n 2-3.)

1  (*NRDC*), 555 U.S. 7, 20 (2008) (citing *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008)); *see also Am.*

2  *Trucking Ass'ns, Inc. v. City of L.A.*, 559 F.3d 1046, 1052 (9th Cir. 2009). A preliminary injunction

3  is an "extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is

4  entitled to such relief." *NRDC*, 555 U.S. at 22. This "clear showing" requires the plaintiff to show

5  more than a mere "possibility" of irreparable harm; instead, he must "demonstrate that irreparable

6  injury is *likely* in the absence of an injunction." *Id.* at 22 (emphasis in original); *American Trucking*,

7  559 F.3d at 1052.

8      Federal Rule of Civil Procedure 65(d) requires that every order granting an injunction must

9  "state the reasons why it issued; state its terms specifically; and describe in reasonable detail–and not

10  by referring to the complaint or other document–the act or acts restrained or required." This mandate

11  for specificity ensures that those against whom an injunction is issued receive fair and precise notice

12  of what conduct is prohibited. *See Halo Mgmt., LLC v. Interland,* Inc., 308 F.Supp.2d 1019, 1027

13  (N.D. Cal. 2003) (citing *Union Pac. R.R. v. Mower*, 219 F.3d 1069, 1077 (9th Cir. 2000)).[3]

14                          **ANALYSIS**

15      The Ninth Circuit, as noted, has elaborated a four-part test for determining whether a moving

16  party is entitled to a preliminary injunction. *See, e.g.*, *American Trucking*, 559 F.3d at 1052. To

17  succeed on a motion for a preliminary injunction, the movant must show: (1) likelihood of success on

18  the merits; (2) likelihood of irreparable harm in the absence of a preliminary injunction; (3) that the

19  balance of equities tips in his favor; and (4) that an injunction is in the public interest. *Id.* (citing

20  *NRDC*, 555 U.S. at 20.) The Court will address each aspect of this test below.

21  //

22  //

23

24      [3]Rule 65 also requires the movant to give security in an amount that the Court considers proper
to pay the costs and damages sustained by any party found to have been wrongfully enjoined or

25  restrained. Fed. R. Civ. P. 65(c). Marketquest has requested the Court dispense with the security
requirement or provide for a nominal bond. (Pl.'s Mem. ISO Mot. 16-17.) BIC has not requested

26  Marketquest give security, nor has it submitted any evidence regarding its likely damages if the Court
grants Marketquest's motion for a preliminary injunction. Thus, the Court will not address the

27  security question here. *Cf. Halo Mgmt.*, 308 F.Supp.2d at 1027 n. 11 (declining to consider the
question of bond where the defendant did not request it); *see also Connecticut General Life Ins. Co.*

28  *v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003) (refusing to address a bond-related
question on appeal where the district court was not presented with the bond issue).

**1. Likelihood of Success on the Merits**

In order to establish a claim for trademark infringement and unfair competition, Marketquest must show: (1) that it has a protectable ownership interest in the mark; and (2) that BIC's use of the mark is likely to cause consumer confusion.[4]  *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011) (citing *Dep't of Parks & Recreation v. Bazaar Del Mundo Inc.*, 448, F.3d 1118, 1124 (9th Cir. 2006).  "The core element of trademark infringement is the likelihood of confusion, *i.e.*, whether the similarity of the marks is likely to confuse consumers about the source of the products."  *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1290 (9th Cir. 1992).  Likelihood of confusion is determined by a fact-intensive, non-exclusive, eight-factor test. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir. 1979); *Surfvivor Media, Inc. v. Survivor Prods.*, 406 F.3d 625, 631 (9th Cir. 2005).

Marketquest argues that it is likely to succeed on the merits of its federal claims because BIC's use of "All in ONE" is "likely to cause, and has, in fact, caused consumer confusion" because of its similarity to Marketquest's ALL-IN-ONE mark.[5]  (Pl.'s Mem. ISO Mot. 6.)  BIC counters that

---

[4]Trademark infringement under Section 32 of the Lanham Act and unfair competition under both Section 43 of the Lanham Act and California Bus. & Prof. Code § 17200 are in this sense coextensive.  *Cleary v. News Corp.*, 30 F.3d 1255, 1262–63 (9th Cir. 1994) ("This Circuit has consistently held that state common law claims of unfair competition and actions pursuant to California Business and Professions Code § 17200 are 'substantially congruent' to claims made under the Lanham Act."); *Enesco Corp. v. Price/Costco Inc.*, 146 F.3d 1083, n.1 (9th Cir. 1998); *Mattel, Inc. v. MCA Records, Inc.*, 296 F.3d 894 (9th Cir. 2002), *cert. denied*, 537 U.S. 1171 (2003) ("The likelihood of confusion test also governs [plaintiff's] [California] state law claims of unfair competition.") Section 32(1) of the Lanham Act applies to federally registered marks and provides:

> Any person who shall, without the consent of the registrant—
> (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive; ... shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1).  Essentially the same standard is embodied in Section 43(a)(1) of the Lanham Act, which applies to both registered and unregistered trademarks.  15 U.S.C. § 1125(a)(1).

[5]Marketquest's motion for a preliminary injunction focuses almost entirely on its ALL-IN-ONE mark, referencing only cursorily its THE WRITE CHOICE mark.  (*see* Pl.'s Mem. ISO Mot. 5-7.)  None of its arguments or evidence in support of the instant motion pertain to BIC's use of THE WRITE CHOICE mark.  Thus, the Court deems Marketquest's request for a preliminary injunction as to THE WRITE CHOICE mark waived, and focuses entirely on the use of the ALL-IN-ONE mark.

1   Marketquest's ALL-IN-ONE marks were obtained fraudulently or have been abandoned and are thus

2   invalid, and also that no likelihood of confusion exists.  (Def.'s Opp'n 7-8.)  Finally, BIC argues that

3   even if a likelihood of confusion exists, its use of the phrase "All in One" is a protected fair use.

4   (Def.'s Opp'n 14.)  The Court addresses each of these arguments in turn.

5   *(A) Validity of the ALL-IN-ONE Marks*

6        To determine whether BIC's use of "All in ONE" constitutes trademark infringement or unfair

7   competition, the Court must first resolve whether Marketquest has a valid, protectable trademark

8   interest in the ALL-IN-ONE mark.[6]

9        Marketquest's registration of the four ALL-IN-ONE marks on the Principal Register in the

10  Patent and Trademark Office (PTO) constitutes prima facie evidence of the validity of each registered

11  mark and of Marketquest's exclusive right to use the marks on the goods and services specified in the

12  registration.  *See* 15 U.S.C. §§ 1057(b); 1115(a).  Further, both parties agree that two of the four ALL-

13  IN-ONE registrations have achieved "incontestable" status, having been in continuous use for five

14  consecutive years subsequent to the date of registration.  15 U.S.C. § 1065; (*see also* Pl.'s Mem. ISO

15  Mot. 8; Def.'s Opp'n 5.)  To the extent that the right to use a registered mark has become incontestable

16  under Section 1065, "the registration serves as conclusive evidence of the validity of the registered

17  mark and of the registration of the mark, of the registrant's ownership of the mark, and of the

18  registrant's exclusive right to use the registered mark in commerce."  15 U.S.C. § 1115(a).  However,

19  even marks with incontestable status remain subject to the defenses set forth in Section 1115(b).

20

21       [6]Before entering into its analysis, the Court notes that it has "discretion to consider otherwise
    inadmissible evidence in ruling on an application for temporary restraining order or preliminary
22  injunction."  *Glow Indus. v. Lopez*, 252 F.Supp.2d. 962, 966 n.1 (C.D. Cal. 2002) (citing *Sierra Club
    v. F.D.I.C.*, 992 F.2d 545, 551 (5th Cir.1993) ("At the preliminary injunction stage, the procedures
23  in the district court are less formal, and the district court may rely on otherwise inadmissible evidence,
    including hearsay evidence. Thus, the district court can accept evidence in the form of deposition
24  transcripts and affidavits" (citations omitted)); *see also Flynt Distrib. Co., Inc. v. Harvey*, 734 F.2d
    1389, 1394 (9th Cir.1984) ("The Harveys argue that Flynt's evidence is hearsay. The urgency of
25  obtaining a preliminary injunction necessitates a prompt determination and makes it difficult to obtain
    affidavits from persons who would be competent to testify at trial. The trial court may give even
26  inadmissible evidence some weight, when to do so serves the purpose of preventing irreparable harm
    before trial"); *see also Mattel, Inc. v. MCA Records, Inc.*, 1998 WL 422641, * 1 (C.D.Cal. Feb.18,
27  1998) (denying both parties' motions to strike declarations because "strict evidentiary rules" do not
    apply at the preliminary injunction phase (citations omitted)).  For these reasons, BIC's motion to
28  strike Marketquest's evidence in support of its motion for preliminary injunction (ECF No. 40) **IS
    DENIED**.

1    BIC claims all four of Marketquest's ALL-IN-ONE registrations were procured fraudulently

2    or have been abandoned, and are thus invalid under Section 1115(b). (Def.'s Opp'n 7.)  Specifically,

3    Section 1115(b)(1) provides the defense "[t]hat the registration or the incontestable right to use the

4    mark was obtained fraudulently," and Section 1115(b)(2) provides the defense "[t]hat the mark has

5    been abandoned by the registrant."  The Court examines both of these asserted defenses.

6    *(i) Fraudulent Procurement of Mark*

7    A trademark registration, even if incontestable, is invalid if it was fraudulently obtained.  *See*

8    15 U.S.C. § 1115(b)(1).  "Fraud in procuring a trademark registration or renewal occurs when an

9    applicant knowingly makes false, material representations of fact in connection with his application."

10   *In re Bose Corp.*, 91 U.S.P.Q.2d 1938, 1939 (Fed. Cir. 2009).  A party seeking cancellation of a mark

11   due to fraud bears a heavy burden.  The party must identify a deliberate attempt by the registrant to

12   mislead the PTO, and must show that misstatements were made with respect to material fact.  *Halo*

13   *Mgmt.*, 308 F.Supp.2d at 1031 (citing *Woodstock's Enter., Inc. v. Woodstocks' Enter., Inc.*, 43

14   U.S.P.Q.2d 1440 (T.T.A.B.1997) ("Fraud in a trademark cancellation is something that must be

15   'proved to the hilt' ....").

16   Here, BIC provides very little evidence to support its theory that Marketquest's ALL-IN-ONE

17   marks were fraudulently procured, especially in the face of such a heavy burden.  BIC merely states

18   that there is "a serious question" as to whether the registrations were obtained fraudulently.  (Def.'s

19   Opp'n 7.)  As its one example, BIC points to Marketquest's submission to the PTO of specimens of

20   use that BIC states, "on information and belief, appear to be computer renderings of products that

21   Plaintiff never intended to sell in commerce."  (Def.'s Opp'n 7-8.)  In other words, BIC objects that

22   Marketquest provided the PTO with mock-ups of its products bearing the ALL-IN-ONE design/logo,

23   when in fact Marketquest never intended to sell its products bearing its own logo; rather, it intended

24   to sell and in fact did sell versions of these products customized with the marks of clients.  (*Id.* at 8;

25   Ex. 14.)  However, BIC does not explain how these catalogues fail to constitute use in commerce of

26   the logo in conjunction with the sale of goods.

27   The Lanham Act defines "use in commerce" as "the bona fide use of a mark in the ordinary

28   course of trade."  15 U.S.C. § 1127.  BIC has not shown that failure to actually sell pens and other

1   items with the ALL-IN-ONE logo imprinted exactly as depicted in its advertisements necessarily

2   means Marketquest did not use the mark in the ordinary course of trade.  A trademark need not

3   "appear in any particular position on the goods." *In re Morganroth*, 208 U.S.P.Q. 284, 288 (T.T.A.B.

4   1980).  Instead, the key to the use in commerce inquiry is whether Marketquest used the mark *as a*

5   trademark, to identify the source of its goods or services.  *Id.*

6       Through its extensive use of the mark on its internet website and catalogues to identify its

7   customizable product lines, Marketquest likely to succeed in establishing it has used the mark in

8   commerce sufficiently extensively to merit some manner of trademark protection.  Further,

9   Marketquest has provided evidence that at least some of its customizable products, such as pens and

10  luggage tags, were in fact sold with the ALL-IN-ONE mark embossed on them, in addition to the

11  customer's imprinted mark.  (Pl.'s Reply 2; Pl.'s Mem. ISO Mot, Ex. 5.)  Thus, BIC has failed to

12  provide the Court with a sufficient basis to find Marketquest did not use its ALL-IN-ONE mark in

13  commerce as a designation of source.  As a result, the Court finds BIC has not satisfied its heavy

14  burden to identify a deliberate attempt by Marketquest to mislead the PTO, nor has it identified a

15  material misstatement required for a finding of fraudulent procurement.

16  *(ii) Abandonment*

17      Under the Lanham Act, a mark may be deemed "abandoned" in one of two situations: (1)

18  "[w]hen its use has been discontinued with intent not to resume such use," and (2) "[w]hen any course

19  of conduct of the owner, including acts of omission as well as commission, causes the mark to become

20  the generic name for the goods or services on or in connection with which it is used or otherwise to

21  lose its significance as a mark." 15 U.S.C. § 1127.

22      BIC's argument that the ALL-IN-ONE marks were abandoned relies upon the same

23  unsupported reasoning as its argument that the marks were fraudulently procured.  BIC asserts that

24  Marketquest "may very well use the ALL IN ONE marks as its trade name or service mark, but no

25  longer in association with its physical products." (Def.'s Opp'n 8.)  However, BIC provides no proof

26  of this contention.  Further, even if the Court takes as true BIC's statement that Marketquest no longer

27  imprints its mark on its customized goods, BIC still does not provide support for the proposition that

28  //

1  Marketquest's extensive use of the mark in advertising its customizable products fails to constitute

2  use in commerce for the purposes of the Lanham Act.

3      For these reasons, the Court concludes Marketquest is likely to succeed in showing it has valid,

4  protectable rights in the ALL-IN-ONE marks.

5  (*B*) *Likelihood of Confusion*

6      Next, the Court turns to the issue of customer confusion.  As previously noted, the Ninth

7  Circuit has used an eight-factor test to analyze the likelihood of confusion in trademark cases, building

8  on the rubric first elaborated in *Sleekcraft*, 599 F.2d 341 (9th Cir. 1979).  The eight factors are: (1)

9  strength of the mark, (2) proximity of the goods, (3) similarity of the marks, (4) evidence of actual

10 confusion, (5) marketing channels used, (6) type of goods and degree of care likely to be exercised

11 by the purchaser, (7) defendant's intent in selecting the mark, and (8) likelihood of expansion of the

12 product lines.  *Id.* at 348-49.  To determine likelihood of confusion, the Court must apply the

13 *Sleekcraft* factors in "a flexible manner, keeping in mind that the eight factors it recited are not

14 exhaustive, and that only some of them are relevant to determining whether confusion is likely" in any

15 given case.  *Network Automation*, 638 F.3d at 1145; *Sleekcraft*, 599 F.2d at 348 n. 11.  The Lanham

16 Act places the burden of proving likelihood of confusion on the party charging infringement even

17 when relying on an incontestable registration.  *KP Permanent Make-Up, Inc. v. Lasting Impression*

18 *I, Inc.*, 543 U.S. 111, 118 (2004).

19 *(i) Strength of the Mark*

20     The strength of the mark, in terms of its ability to link products to their source, determines the

21 amount of protection from infringement that mark should be afforded.  *See Sleekcraft*, 559 F.2d at 349;

22 *Brookfield Commc'ns, Inc. v. West Coast Entm't Corp.*, 174 F.3d 1036, 1058 (9th Cir. 1999) ("The

23 stronger a mark—meaning the more likely it is to be remembered and associated in the public mind

24 with the mark's owner—the greater the protection it is accorded by the trademark laws.")

25     In determining the strength of the mark, courts may look to two relevant measurements:

26 conceptual strength and commercial strength.  *Network Automation*, 638 F.3d at 1149.  A mark's

27 conceptual strength depends largely on the obviousness of the connection between the mark and the

28 goods or services to which it refers.  *Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand*, 618

F.3d 1025, 1032 (9th Cir. 2010).  Marks may be classified according to a spectrum of five categories originally formulated by Judge Friendly, ranging from weakest to strongest: generic, descriptive, suggestive, arbitrary, or fanciful.  *Id.*  The other relevant measurement, commercial strength, is based on "actual marketplace recognition, and thus advertising expenditures can transform a suggestive mark into a strong mark."  *Network Automation*, 638 F.3d at 1149 (quotations omitted).

Conceptual strength attempts to quantify the inherent distinctiveness of the mark.  At one end of the spectrum, "generic marks refer to the genus of which the particular product is a species, such as 'bread' or 'door,' and are not registerable as trademarks."  *Fortune Dynamic*, 618 F.3d at 1033 (quotations omitted).  At the other end of the spectrum are arbitrary marks, "actual words with no connection to the product—such as Apple computers and Camel cigarettes," and fanciful marks, "made-up words with no discernable meaning—such as Kodak film and Sony electronics that are inherently distinctive and therefore receive maximum trademark protection."  *Id.*  In the middle are descriptive and suggestive marks.  Descriptive marks "tell[ ] something about the product; [they] will be protected only when secondary meaning is shown."  *Sleekcraft*, 599 F.2d at 349.  Suggestive marks, one step further along the spectrum of conceptual strength, "subtly connote something about the products.  Although less distinctive than an arbitrary or fanciful mark and therefore a comparatively weak mark, a suggestive mark will be protected without proof of secondary meaning."  *Id.*  In the conceptual strength inquiry, registration of the mark "adds something on the scales," but is not determinative.  *Zombondo Entertainment, LLC v. Falls Media, LLC*, 602 F.3d 1108, 1115 (9th Cir. 2010).

In terms of conceptual strength, BIC correctly points out that the incontestable status of two of the ALL-IN-ONE marks does not, alone, establish a strong mark.  *Miss World (UK), Ltd. v. Mrs. America Pageants, Inc.*, 856 F.2d 1445, 1449 (9th Cir. 1988); (*see also* Def.'s Opp'n 9.)  BIC argues that the ALL-IN-ONE mark is a descriptive term that is weak and should merit only limited trademark protection.  (Def.'s Opp'n 9-10.)  BIC frames the ALL-IN-ONE mark as a description of Marketquest's services "as a one-stop source for a variety of customizable products."  (Def.'s Opp'n 10.)

//

1    Although it is true that incontestable status does not determine whether a mark is strong or

2    weak, incontestable marks are conclusively presumed to have secondary meaning. *Miss World*, 856

3    F.2d at 1448 n. 4; 15 U.S.C. § 1115(b).  Further, Marketquest persuasively argues that the ALL-IN-

4    ONE mark is at least suggestive, rather than descriptive, and as such is inherently distinctive.  (Pl.'s

5    Reply 4.)  Marketquest contends that "[n]othing in the phrase ALL IN ONE immediately conveys

6    knowledge to a consumer that [Marketquest] offers customized imprinting services on the business

7    promotion merchandise it supplies to wholesale distributors."  (*Id.*)  Instead, Marketquest argues that

8    "ALL IN ONE suggests or connotes, rather than describes, a characteristic of its services and requires

9    consumer imagination to determine what those services are."  (*Id.*)

10    In determining the conceptual strength of a mark, the Court may be aided by the "imagination

11    test" and the "need test."  *Miss World*, 856 F.2d at 1449.  The imagination test asks "how much

12    imagination a consumer must use to associate a given mark with the goods or services it identifies."

13    *Id.*  Essentially, the more imagination required to make the association, the stronger the mark.  The

14    need test approaches the question "from the opposite end."  *Id.*  It asks "to what extent a mark is

15    actually needed by competitors to identify their goods or services."  *Id.*  If "the message conveyed by

16    the mark about the goods or services is so direct and clear that competing sellers would be likely to

17    [need to] use the term in describing or advertising their goods [or services], then this indicates the

18    mark is descriptive."  *Id.*  There is an inverse relationship between the imagination test and the need

19    test; as the amount of imagination required increases, the need decreases.  *Id.*

20    Here, the Court agrees with Marketquest that ALL-IN-ONE is at least a suggestive mark

21    because it "requires a mental leap from the mark to the product," and as a registered trademark it is

22    inherently distinctive. *Brookfield*, 174 F.3d at 1058; *see also Network Automation*, 638 F.3d  at 1150.

23    Categorizing trademarks is "necessarily an imperfect science. Far from being neatly distinct and

24    discrete, trademark categories often blur at the edges and merge together." *Fortune Dynamic*, 618

25    F.3d at 1033.  However, here the mark's need aspect is plainly quite low.  In describing a company

26    that sells customizable business promotion merchandise, the phrase "all in one" is not needed.

27    Correspondingly, the mark's imagination aspect is high.  The Court could imagine a connection

28    between the phrase "all in one" and a service, like Marketquest's, that offers merchandise and

advertising combined—a useful item and an advertisement, *all in one* product, perhaps—but this connection is far from obvious, nor was it supplied by either party.  While BIC is correct that the phrase "all in one" comes closest to describing the "one-stop source" aspect of Marketquest's service, it does not explain how the phrase in any way describes customizable business promotion merchandise, which is in essence the heart of Marketquest's service.

The Court's determination that the ALL-IN-ONE mark is inherently distinctive when applied to customizable promotional merchandise may not end the inquiry  into the strength of the mark. *Network Automation*, 638 F.3d at 1150.  As stated above, commercial strength and the sophistication of the consumer may also play a role.  *See id.*  However, the Court cannot discern from the proffered evidence a basis to adequately determine commercial strength here.  Further, as an evidence-intensive inquiry, consideration of commercial strength is unnecessary at the preliminary injunction stage.  *Id.*  Therefore, the Court finds that this factor weighs in favor of Marketquest.

*(ii) Proximity of the Goods*

The more closely related the goods, the higher the danger that the consumer public will "mistakenly assume there is an association between the producers of the related goods, though no such association exists."  *Sleekcraft*, 599 F.2d at 350.  In determining the relatedness of goods, courts consider: (1) whether the goods are complementary; (2) whether the products are sold to the same class of purchasers; and (3) whether the goods are similar in use and function.  *Id.*

Here, BIC acknowledges that the goods and services at issue are similar.  (Def.'s Opp'n 10.)  Both parties sell customizable promotional merchandise such as pens, USB flash drives, computer peripherals, and other office-related products.  (Pl.'s Mem. ISO Mot. 10.)  Because the products at issue here are virtually interchangeable, this factor "may be helpful, but it must be considered in conjunction with the labeling and appearance of the advertisements and the degree of care exercised by the consumers." *Network Automation*, 638 F.3d at 1150; *see also Playboy Enters., Inc. v. Netscape Commc'ns Corp.*, 354 F.3d 1020, 1035 (9th Cir. 2004) (Berzon, J., concurring) (emphasizing that the proximity of the goods becomes less important if advertisements are clearly labeled or consumers exercise a high degree of care, because rather than being confused, the consumer would merely be confronted with choices among similar products.)

1    Thus, although the Court finds that this factor decidedly weighs in favor of Marketquest, the

2    Court should not view this factor in isolation, and must consider whether the parties' status as direct

3    competitors would actually lead to a likelihood of confusion in light of the following factors.

4    *(iii) Similarity of the Marks*

5    This is an important factor in the current analysis because, "[w]here two marks are entirely

6    dissimilar, there is no likelihood of confusion." *Perfumebay.com Inc. v. eBay, Inc.*, 506 F.3d 1165,

7    1174 (9th Cir. 2007).  The similarity of the marks used by both parties is measured in terms of

8    appearance, sound, and meaning.  *Sleekcraft*, 559 F.2d at 351.  Each of these aspects should be

9    considered as they are encountered by consumers in the market for that good or service.  *Id.*

10   Standing alone the words used are identical in all respects.  Marketquest uses the phrase and

11   logo "ALL-IN-ONE" or "All in One" to mark its catalogues and products, while BIC uses the phrase

12   "All in ONE" on its 2011 NORWOOD Catalogue.  (*See* Pl.'s Reply Appx. A.)  Aside from slight

13   variations in capitalization and punctuation, the words are the same.

14   BIC emphasizes that the words appear differently on the two companies' catalogues.  (Def.'s

15   Opp'n 11.)  The Court agrees that the font and graphical appearance of the phrase as used by the two

16   parties is distinguishable.  The ALL-IN-ONE logo/design used by Marketquest contains distinctive

17   colors and graphics, consisting of a red slanted box with white outlined lettering, with the word "IN"

18   backed by a yellow box, all encircled by a curling white line.  (*See* Pl.'s Mem. ISO Mot., Ex. 5.)

19   BIC's use, on the other hand, is not graphically distinctive, consisting of the words "All in ONE" in

20   plain yellow or black type.  (*See* Pl.'s Mem. ISO Mot., Ex. 6.)

21   However, Marketquest's use of its ALL-IN-ONE marks is not confined to the logo/design.

22   For example, it also uses the phrase as its web domain name, and apparently imprints some of its

23   products with the words "All-In-One" in plain type.  (*See* Pl.'s Mem. ISO Mot., Ex. 5.)  Thus, even

24   the appearance of the mark is often similar.  In the similarity analysis, "similarities weigh more

25   heavily than differences."  *Sleekcraft*, 599 F.2d at 351.

26   Lastly, BIC argues that its use of the NORWOOD mark wherever the phrase "All in ONE"

27   appears on its catalogues should weigh in its favor in the similarity analysis, as it identifies its

28   //

- 13 -                                                                    11cv618

1    products in the marketplace as clearly originating from BIC, and differentiates the products in the

2    consumer's eye.  (Def.'s Opp'n 11.)

3          In *Sleekcraft*, the Ninth Circuit noted that the use of a housemark can reduce the likelihood of

4    confusion, but concluded that the effect was negligible where the housemark was inconspicuous and

5    the logo often absent.  *Sleekcraft*, 599 F.2d at 351.  Here, BIC's use of its housemark, NORWOOD,

6    is not inconspicuous, nor is the logo often absent.  To the contrary, the NORWOOD logo appears as

7    the largest words on the cover of the Catalogue, with the phrase "All in ONE" appearing in slightly

8    smaller type, below and to the side.  Even on the first page of the Catalogue, where "All in ONE" is

9    larger than the NORWOOD mark, the NORWOOD mark appears at least five times on the page.

10   (Pl.'s Mem. ISO Mot. Ex. 6.)

11         However, Courts have found that "the addition of a celebrity 'housemark' to an allegedly

12   infringing mark may heighten confusion rather than reduce it," especially in cases where reverse

13   confusion is alleged.  *Glow Indus. v. Lopez*, 252 F.Supp.2d 962, 995 (C.D. Cal. 2002) (citing

14   *Americana Trading, Inc. v. Russ Berrie & Co.*, 966 F.2d 1284, 1288 (9th Cir.1992) ("[T]he

15   prominence of Russ's housemark may serve to create reverse confusion that Russ, and not Amtra, is

16   the source of Amtra's 'Wedding Bears.' Russ's housemark therefore does not, as a matter of law,

17   render its use of 'Wedding Bear' non-similar to Amtra's trademark. ... Indeed, use by Russ of its

18   housemark along with Amtra's trademark may be an aggravation and not a justification, for it is openly

19   trading in the name of another."))

20         Marketquest argues that, as in *Americana Trading*, BIC's usage of the ALL-IN-ONE mark in

21   conjunction with its own well-known mark actually heightens the likelihood of confusion in the

22   similarity analysis.  (Pl.'s Reply 6-7.)  Marketquest further asserts that, viewing all of the 2011

23   NORWOOD Catalogues in context, the placement of the phrase "All in ONE" below the NORWOOD

24   mark, compared to the similar placement of other phrases (trademarked brands such as Atchison, RCC

25   Koozie, Triumph Calendars, Good Value Calendars, etc.) below the NORWOOD mark on the cover

26   of other catalogues, could imply the use of "All in ONE" as a mark to designate source.  (*See* Pl.'s

27   Reply 6-7, Ex. 13.)  Marketquest also notes that the phrase "All in ONE" appears again on the first

28   //

1    page of the NORWOOD Catalogue, this time at the top of the page, as the largest words on the page.

2    (*See* Pl.'s Mem. ISO Mot. Ex. 6.)

3         The Court agrees that such reverse confusion is possible here.   However, the context

4    Marketquest depicts for BIC's use of the phrase does not tell the whole story. The phrase "All in

5    ONE" appears in a different position on the cover of that Catalogue than the other marks on the

6    catalogues Marketquest points to, such that the covers are not directly analagous. (*See* Pl.'s Reply Ex.

7    13.) Instead of directly below the NORWOOD mark, the phrase "All in ONE" appears smaller, lower,

8    and to the side. (*Id.*)  In addition, on the first page of the NORWOOD Catalogue, in which "All in

9    ONE" appears in large font at the top of the page, a blurb on the side of that same page explains that

10   this is the "NEW! Norwood All in ONE Catalog.  Our primary product resource, featuring all product

11   lines in ONE catalog."  (Pl.'s Mem. ISO Mot., Ex. 6.)  On page 14 of what is presumably the same

12   2011 NORWOOD Catalogue, text further explains the use of the phrase: "2011 Catalog: Your all-in-

13   one product resource! The new All in ONE Norwood Catalog includes 14 different product categories

14   and the brands you trust, including Atchison – now exclusive to Norwood. ... All categories in ONE

15   Flyer ..." (*Id.*)  These descriptions may do some work in clarifying potential consumer confusion as

16   to whether or not NORWOOD was using the phrase "All in ONE" as a mark to designate the source

17   of the goods in the catalogue.

18        In the context of these facts, BIC's use of the NORWOOD mark may mitigate against a finding

19   of similarity as consumers encounter the phrase in the marketplace.  BIC's marketing materials clearly

20   explain its use of the phrase as the title of its Catalogue, such that consumers could deduce BIC

21   intended to use the phrase in its descriptive sense, referring to the Catalogue's omnibus contents, not

22   as a mark indicating the source of the products contained therein.  However, given the reverse

23   confusion context that Marketquest alleges (*see* Pl.'s Reply 5 n.13), and the extreme similarity in

24   proximity of goods and marketing channels of both parties (*see infra.*), the Court cannot conclude that

25   BIC's addition of the NORWOOD housemark renders the parties' uses of the phrase "All in One"

26   completely dissimilar.  *See, e.g.*, *Glow*, 252 F.Supp.2d at 995 ("[I]n the absence of survey or other

27   evidence of consumer reaction to the products as encountered in the marketplace, [the Court declines

28   to find that] the addition of the 'J.Lo' housemark mitigates the likelihood of consumer confusion.")

1    For these reasons, balancing the extreme similarity of the marks in many respects with the

2    mitigating facts tending to belie this similarity, the Court concludes that this factor weighs slightly in

3    favor of Marketquest.

4    *(iv) Evidence of Actual Confusion*

5    "Evidence that use of the two marks has already led to confusion is persuasive proof that

6    confusion is likely." *Sleekcraft*, 559 F.2d at 352.  However, such evidence is difficult to provide, and

7    courts often discount it as unclear or insubstantial.  *Id.*  As a result, providing evidence of actual

8    confusion is not necessary to a finding of likelihood of confusion.  *Network Automation*, 638 F.3d at

9    1151.  At the preliminary injunction stage of litigation, such evidence is more likely to be sparse or

10   nonexistent.  *See id.*  Some courts have found that, because reliable evidence of actual confusion is

11   difficult to obtain in trademark infringement cases, any such evidence is "substantial evidence that

12   confusion is likely." *See, e.g.*, *Jockey Int'l, Inc. v. Burkard*, 185 U.S.P.Q. 201, 207 (S.D. Cal. 1975).

13   Here, Marketquest has provided what is akin to anecdotal evidence of several instances of

14   actual confusion.  (Pl.'s Mem. ISO Mot. 11; Pl.'s Reply 6.)  Marketquest provides declarations from

15   three agents who were confused by the NORWOOD Catalogue and thought the two companies were

16   either the same or affiliated.  (*Id.*; Strong Decl. ¶ 4; Smidt Decl. ¶ 4; Moreno Decl. ¶ 3.)  In addition,

17   Marketquest provides the declaration of Harris Cohen, founder and President of Marketquest, who

18   states that on August 11, 2011, the company received an e-mail from a distributor who found BIC's

19   "use of All-In-One's Mark there to be 'odd and confusing,' and thought that a 'majority' of industry

20   distributors who were not as experienced as him could be confused by the advertising."  (Pl.'s Mem.

21   ISO Mot. 11-12; Cohen Decl. ¶ 30; Ex. 9.)  Marketquest also points to two instances in which BIC

22   representatives referred to the NORWOOD Catalogue intentionally as its "All in ONE" Catalogue at

23   trade shows when talking to other industry representatives.  (Pl.'s Mem. ISO Mot. 12; Land Decl. ¶

24   4; Cohen Decl. ¶ 29.)

25   Although five or six instances of actual customer confusion might be enough to find substantial

26   evidence that confusion is likely in some circumstances, the facts here do not support such a finding.

27   All of Marketquest's anecdotes involve experienced industry distributors or agents, who are likely to

28   be sophisticated consumers and investigate any potential confusion. *See, e.g.*, *Glow*, 252 F.Supp.2d

1  at 1000 ("Here, at most, Glow, Inc. present (*sic*) de minimis evidence of actual confusion; some of it,

2  moreover, involves 'sophisticated' wholesalers who might be expected to inquire about the affiliation,

3  if any, between the companies.")  Although it is well established that initial interest confusion may

4  be actionable, these few instances of alleged initial confusion are nonetheless weak evidence of actual

5  confusion.  *Brookfield*, 174 F.3d at 1062-64; *see also Moose Creek, Inc. v. Abercrombie & Fitch Co.*,

6  331 F.Supp.2d 1214, 1230 n. 9 (C.D. Cal. 2004), *aff'd* 114 Fed. Appx. 921 (9th Cir. 2004).

7  Furthermore, the importance of this factor is diminished at the preliminary injunction stage.  *Network*

8  *Automation*, 638 F.3d at 1151.  Accordingly, the Court finds this factor weighs only very slightly in

9  Marketquest's favor.

10  *(v) Marketing Channels Used*

11      "Convergent marketing channels increase the likelihood of confusion." *Network Automation*,

12  638 F.3d at 1151.  In *Sleekcraft*, the two products were sold in niche marketplaces, including boat

13  shows, specialty retail outlets, and local and national trade magazines, using similar sales methods and

14  price ranges.  *Sleekcraft*, 599 F.2d at 353.  This factor becomes less important "when the marketing

15  channel is less obscure."  *Network Automation*, 638 F.3d at 1151 (finding the Internet to be too broad

16  a shared marketing channel to merit any weight in this factor.)

17      Here, BIC concedes that the parties occupy similar marketing channels, but instead attempts

18  to blur the issue by emphasizing that the marketing channels consist of sophisticated customers.

19  (Def.'s Opp'n 13.) The Court considers the sophistication of customers next.  However sophisticated,

20  the pool of potential customers is virtually identical for both parties.  The two companies are direct

21  competitors, as both supply customizable promotional merchandise.  Both companies advertise their

22  products and services via the Internet, through printed catalogues, and at trade shows.  (Pl.'s Mem.

23  ISO Mot. 12.)  Accordingly, the Court finds this factor favors Marketquest.

24  *(vi) Type of Goods and Degree of Care Likely to be Exercised by the Purchaser*

25      Courts look at the likelihood of confusion through the lens of the reasonably discriminating

26  purchaser.  *See, e.g.*, *Network Automation*, 638 F.3d at 1152.  "When the buyer has expertise in the

27  field, a higher standard is proper though it will not preclude a finding that confusion is likely."

28  *Sleekcraft*, 599 F.2d at 353.  When goods are expensive, the buyer might be expected to exercise

greater care, though confusion may still be likely.  *Id.*  Thus, the Court must examine how discriminating the average buyer of customizable promotional merchandise is likely to be.

BIC argues the targeted consumers of both parties' products are sophisticated. (Def.'s Opp'n 14.)  BIC cites the fact that the minimum order of each customized item listed in Marketquest's catalogue is 250 or 300, and that consumers seeking branded merchandise are likely to be institutions and companies rather than individuals.  (*Id.*)  Marketquest failed to address this factor in its motion, stating that it had yet to "fully investigate this factor."  (Pl.'s  Mem. ISO Mot. 13.)  Instead, Marketquest points to the previously referenced instances of actual confusion to counter BIC's allegations of sophistication.  (Pl.'s Reply 8.)

The degree of consumer care and sophistication can be proven by survey evidence, expert testimony, or inference.  *See, e.g.*, *Star Indus., Inc. v. Bacardi & Co. Ltd.*, 412 F.3d 373 (2d Cir. 2005), *cert. denied*, 126 S.Ct. 1570 (2006).  Here, the parties have provided no  survey evidence or expert testimony.  Thus, the Court must rely on its own inference to determine whether the reasonably discriminating purchaser of customizable promotional merchandise should be held to a heightened standard.

The evidence currently before the Court indicates that buyers are likely to be sophisticated, institutional buyers placing bulk orders for corporate promotional purposes.  The marketing materials of both parties appear to be aimed at institutional purchasers.  However, the parties have barely addressed the factor, presenting the Court with very little evidence from which to form a solid conclusion.

It is possible, for example, that the average customer, although institutional, is not likely to exercise a heightened standard of care when making a purchase of 300 branded pens which will cost its company 50 cents each.  (*See, e.g.*, Pl.'s Mem. ISO Mot. Ex. 5.)  Further, customers, although institutional, may be likely to be companies whose main business has no relation to the purchase of customized promotional products, differentiating this situation from others in which courts have found professional consumers are likely to exercise a high degree of care.  *See, e.g.*, *Moose Creek*, 331 F.Supp.2d at 1231 ("Plaintiff's customers are professional commercial clothing buyers and they are therefore likely to be familiar with the retail clothing market, likely to exercise a high degree of care

in selecting wholesale clothing to purchase and thus unlikely to be easily confused by both parties' use of a moose on their marks.")  In the alternative, it is possible that customers are more likely to be marketing representatives or agents who may have a lot of specific knowledge about customizable promotional products.

Given Marketquest's failure to contest BIC's assertion that the average customer is highly sophisticated and the lack of evidence pertaining to this issue, the Court finds this factor weighs slightly in favor of BIC but should be accorded little weight in the present analysis.

*(vii) Defendant's Intent in Selecting the Mark*

"When the alleged infringer knowingly adopts a mark similar to another's, reviewing courts presume that the defendant can accomplish his purpose: that is, that the public will be deceived." *Sleekcraft*, 599 F.2d at 354.  Thus, if Marketquest can show that BIC deliberately adopted the ALL-IN-ONE mark in order to obtain advantage from Marketquest's goodwill, this may weigh heavily in favor of finding a likelihood of confusion.

Marketquest argues that bad faith is "the only reasonable explanation for Defendants' choice" of the phrase "All in ONE" for its NORWOOD Catalogue.  (Pl.'s Mem. ISO Mot. 13.)  Marketquest alleges that BIC was "well aware of All-In-One in advance" of choosing the phrase for its catalogue, and that the choice was an "attention getting symbol."  (Pl.'s Reply 9.)  To show bad faith, Marketquest alludes to several other marks it claims BIC "raided," including its THE WRITE CHOICE mark, which it originally claimed was infringed in the present action but has not pursued in the instant motion.  (*Id.*; *see also* FAC ¶ 16.)  BIC counters that it used the phrase "in good faith in an effort to streamline the number of catalogues Norwood would have to distribute, and to describe what the catalogue contains."  (Def.'s Opp'n 14; Bauer Decl. ¶ 7.)  In addition, BIC emphasizes that it displays the phrase next to its NORWOOD trademark, which indicates it did not intend to deceive consumers.  (*Id.*)

The Ninth Circuit has recently emphasized that intent should not be considered in isolation, and that, "much like the proximity of the goods, the defendant's intent may be relevant here, but only insofar as it bolsters a finding that the use of the trademark serves to mislead consumers rather than truthfully inform them of their choice of products." *Network Automation*, 638 F.3d at 1153.  In

1    *Network Automation*, the district court failed to consider whether the defendant's intentional choice

2    to use the plaintiff's mark was based on a bad faith intent to deceive, or a permissible intent to

3    compare the two products. *Id.* Here, BIC has not alleged its use was based on an intent to compare.

4    Instead, BIC asserts its use was unintentional and that it did not mean to conjure up Marketquest's

5    products or services in any way in the minds of consumers. (Def.'s Opp'n 14-15.)

6         In the absence of any evidence that BIC acted with a bad faith intent when it used the phrase

7    "All in ONE" on its 2011 NORWOOD Catalogue, the Court does not impute such intent based on

8    Marketquest's circumstantial allegations. Accordingly, this factor weighs in favor of BIC.

9    *(viii) Likelihood of Expansion of the Product Lines*

10        The parties agree the Court need not consider this factor here, where the product lines already

11   entirely overlap. (Pl.'s Mem. ISO Mot. 14; Def.'s Opp'n 14.) "Where two companies are direct

12   competitors, this factor is unimportant." *Network Automation*, 638 F.3d at 1153; *cf. Brookfield*, 174

13   F.3d at 1060. Accordingly, the Court finds this factor should be accorded no weight.

14   *(ix) Sleekcraft Factors Weigh in Favor of Finding a Likelihood of Confusion*

15        The Court notes that this likelihood of confusion test is fact-intensive, and many of the factors

16   considered above are dependent upon factual conclusions that ultimately should be sent to trial for

17   resolution. However, the Court must make a preliminary decision here for the purposes of this motion.

18   Upon weighing the *Sleekcraft* factors, the Court concludes that the majority weigh in favor of finding

19   a likelihood of confusion. Each of the first through fifth factors weighs at least slightly in favor of

20   Marketquest, and only the sixth and seventh factors weigh against. Having found some likelihood of

21   confusion, the Court now turns to BIC's argument that the affirmative defense of fair use should bar

22   liability here.

23   ***(C) Fair Use***

24        BIC argues that even if the Court finds the likelihood of confusion factors weigh in favor of

25   Marketquest, the "fair use" defense should shield BIC from infringement liability. (Def.'s Opp'n 15.)

26   An affirmative defense of fair use is available to a party who uses a descriptive word "otherwise than

27   as a mark ... [and] fairly and in good faith only to describe the goods or services of such party, or their

28   geographic origin." 15 U.S.C. § 1115(b)(4). This Section of the Lanham Act codifies a longstanding

common law principle that "[t]he use of a similar name by another to truthfully describe his own product does not constitute a legal or moral wrong, even if its effect be to cause the public to mistake the origin ... of the product." *William R. Warner & Co. v. Eli Lilly & Co.*, 265 U.S. 526, 529 (1924); *Fortune Dynamic*, 618 F.3d at 1039.  Subjective good faith is relevant to the inquiry, but the main focus of the analysis is on whether the use of the mark was "objectively fair."  *Fortune Dynamic*, 618 F.3d at 1039.

The Supreme Court recently clarified that the affirmative defense of fair use may be validly asserted even in cases where some degree of likelihood of confusion exists.  *KP Permanent Make-Up*, 543 U.S. at 120 ("If a plaintiff succeeds in making out a prima facie case of trademark infringement, including the element of likelihood of consumer confusion, the defendant may ... raise an affirmative defense to bar relief... [including fair use].").  However, the Ninth Circuit has explained that the degree of customer confusion remains a factor in evaluating fair use.  *KP Permanent Make-Up Inc. v. Lasting Impression I*, 408 F.3d 596, 609 (9th Cir. 2005).  Among the relevant factors for consideration in determining the fairness of the use are "the degree of likely confusion, the strength of the trademark, the descriptive nature of the term for the product or service being offered by [the plaintiff] and the availability of alternate descriptive terms, the extent of the use of the term prior to the registration of the trademark, and any differences among the times and contexts in which [the plaintiff] has used the term."  *Id.*

Here, although the Court has found that the phrase ALL-IN-ONE is an inherently distinctive mark that is not merely descriptive of Marketquest's service providing customizable promotional products, it is nonetheless a phrase commonly used by companies in general to describe the comprehensive nature of their services.  The Supreme Court has explained that the Lanham Act exhibits a certain leniency where a descriptive phrase was selected to be a mark.  *Id.* at 122.  "If any confusion results, that is a risk the plaintiff accepted when it decided to identify its product with a mark that uses a well known descriptive phrase."  *Id.*  (citing *Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.*, 469 U.S. 189 (1985) (noting safeguards in Lanham Act to prevent commercial monopolization of language); *Car-Freshener Corp. v. S.C. Johnson & Son, Inc.*, 70 F.3d. 267, 269 (2d Cir. 1995)

//

1   (noting importance of "protect[ing] the right of society at large to use words or images in their primary

2   descriptive sense")).

3       The question remains whether BIC's use of the phrase "All in ONE" on its 2011 NORWOOD

4   Catalogue was otherwise than as a mark and only to describe its goods and services. To determine

5   whether a term is being used as a mark, courts may look for indications that the term is being used to

6   associate goods with a certain manufacturer. *Fortune Dynamic*, 618 F.3d at 1040 (citing *Sierra*

7   *On–Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1423 (9th Cir.1984)). Other indications of

8   trademark use include "whether the term is used as a symbol to attract public attention, which can be

9   demonstrated by the lettering, type style, size and visual placement and prominence of the challenged

10  words, ... [and] whether the allegedly infringing user undertook precautionary measures such as

11  labeling or other devices designed to minimize the risk that the term will be understood in its

12  trademark sense." *Fortune Dynamic*, 618 F.3d at 1040 (citations omitted).

13      Here, the Court finds BIC likely used the phrase "All in One" otherwise than as a mark and

14  solely in its descriptive sense, to distinguish one particular catalogue as a catch-all catalogue

15  containing all of BIC's customizable promotional products. The NORWOOD mark was prominently

16  displayed wherever the words "All in One" appeared, and BIC also explained its use of the phrase in

17  several places in the catalogue, such as: "Our primary product resource, featuring all product lines in

18  ONE catalog." (Pl.'s Mem. ISO Mot., Ex. 6.) Although Marketquest has offered evidence that BIC's

19  use could be confused for an indication of source by comparison to NORWOOD's other catalogues

20  tailored to the sale of other trademarked items or through a few instances of documented actual

21  confusion, the Court finds this evidence unpersuasive.

22      The last factor in the fair use analysis asks whether BIC has exercised "good faith." This

23  inquiry is similar to the intent factor in the likelihood of confusion analysis, focusing on whether BIC

24  intended to capitalize on Marketquest's good will in adopting its mark *Fortune Dynamic*, 618 F.3d

25  at 1043. Marketquest offers no evidence of malicious intent on the part of BIC, other than assertions

26  that BIC must have known about the ALL-IN-ONE mark and thus must have had bad faith. (Pl.'s

27  Reply 9.) However, as above, this is not sufficient indication of bad faith to impute malicious intent.

28  Further, using an objective fairness standard, the explanations BIC included in its catalogue of its use

of the phrase "All in One" persuade the Court that use was likely fair.  Thus, the Court finds BIC is likely to succeed on its affirmative defense of fair use.

**2. The Other Preliminary Injunction Factors**

Because the Court finds BIC is likely to succeed in asserting a fair use defense, it concludes Marketquest is unlikely to succeed on the merits of its trademark infringement case.  Thus, the Court need not examine the other preliminary injunction factors: the likelihood of irreparable harm in the absence of a preliminary injunction; the balance of equities; and the public interest.  *See Network Automation*, 638 F.3d at 1154 (finding that there is no need to reach the three remaining preliminary injunction elements where there is no likelihood of confusion.)  Marketquest has fallen short of making the required showing that it is likely to succeed on the merits of its trademark infringement action.  As a result, the Court finds the relief Marketquest seeks is better left to a trial on the merits and, if successful, an appropriately tailored permanent injunction.

**CONCLUSION**

For the foregoing reasons, the Court **DENIES** Marketquest's motion for a preliminary injunction.

**IT IS SO ORDERED**.

DATED:  November 7, 2011

Honorable Janis L. Sammartino
United States District Judge