**EXHIBIT 1**

**EXPERT REPORT OF HAL PORET IN MATTER OF
MARKETQUEST GROUP V. BIC CORPORATION ET AL**

**LIKELIHOOD OF CONFUSION SURVEY REGARDING USE OF
"ALL IN ONE" IN NORWOOD 2011 CATALOG**

REPORT PREPARED FOR:
Gordon & Rees L.L.P.
101 W. Broadway, Suite 2000
San Diego, CA 92101
Attorneys for Bic Corp.

PREPARED BY:
Hal Poret
ORC International
625 Avenue of the Americas
New York, NY   10011

April, 2012

# *TABLE OF CONTENTS*

Page #

BACKGROUND AND PURPOSE -------------------------------------------------- 1
STUDY AUTHORSHIP AND QUALIFICATIONS---------------------------- 2
STUDY DESIGN-------------------------------------------------------------------- 3
SUMMARY OF KEY FINDINGS------------------------------------------------- 21
METHODOLOGY------------------------------------------------------------------- 22
     THE RELEVANT UNIVERSE OF INTEREST ------------------------- 22
     SAMPLING PLAN------------------------------------------------------- 25
     DOUBLE-BLIND INTERVIEWING ----------------------------------- 28
     INTERVIEWING PROCEDURES------------------------------------------ 28
     DATA PROCESSING ---------------------------------------------------- 29
     INTERVIEWING PERIOD------------------------------------------------- 29
DETAILED FINDINGS ------------------------------------------------------------ 30
CONCLUSIONS--------------------------------------------------------------------- 35

APPENDICES
     APPENDIX A:   CURRICULUM VITAE OF STUDY'S AUTHOR
     APPENDIX B:   INSTRUCTIONS/QUESTIONNAIRES/DISPOSITION
     APPENDIX C:   MATERIALS REVIEWED/FEES CHARGED
     APPENDIX D:   DATA FILE
     APPENDIX E:   IMAGES OF ALL IN ONE WEBSITE SHOWN
     APPENDIX F:   IMAGES OF NORWOOD CATALOG (TEST GROUP)
     APPENDIX G:   IMAGES OF NORWOOD CATALOG (CONTROL GROUP)
     APPENDIX H:   IMAGES OF THIRD PARTY CATALOGS
     *(APPENDICES D – H TO BE PROVIDED ELECTRONICALLY)*

## *BACKGROUND AND PURPOSE*

Marketquest Group, Inc. ("Marketquest") uses the mark ALL-IN-ONE in connection with the production, advertising and sale of customizable promotional products, such as pens, mugs, flashdrives and other office and computer accessories.

Bic Corporation's ("Bic") Norwood division also sells customizable promotional products.  In its 2011 Norwood catalog of customizable promotional products, the words "All in ONE" appeared on the front cover and on the first page of the catalog.

Marketquest has filed a lawsuit against Bic alleging, among other things, that the use of the words "All in ONE" on the 2011 Norwood catalog is likely to have caused confusion with respect to Marketquest's ALL-IN-ONE mark.[1]

Through its attorneys, Gordon & Rees LLP, Bic retained me to design and conduct a survey to determine the likelihood, if any, that prospective purchasers of customizable promotional products would be confused by the use of the words "All in ONE" on the Norwood catalog.  This report details the methodology and results of the survey.

---

[1] Marketquest also raises claims relating to its "THE WRITE CHOICE" mark.  These claims are not discussed, as the survey did not test use of this name.

1

## STUDY AUTHORSHIP AND QUALIFICATIONS

This study was designed, supervised, and implemented by ORC International under the supervision of Hal L. Poret, Senior Vice President.

I have personally designed, supervised, and implemented over 400 surveys measuring perception, opinion, and behavior.  Over 150 of these surveys have concerned consumer perception in the context of trademarks.   I have personally designed numerous studies that have been admitted as evidence in legal proceedings, and I have been accepted as an expert in survey research on numerous occasions by U.S. District Courts, the Trademark Trial and Appeal Board, the FTC, and the National Advertising Division of the Council of Better Business Bureaus (NAD).

I have frequently spoken at major intellectual property and legal conferences on the topic of how to design and conduct surveys that meet legal evidentiary standards for reliability, including conferences held by the International Trademark Association (INTA), American Intellectual Property Law Association, Practicing Law Institute, Managing Intellectual Property, Promotions Marketing Association, American Conference Institute, and various bar organizations.   In 2010, I published an article regarding trademark surveys in The Trademark Reporter, a journal published by the International Trademark Association.

In addition to my survey research experience, I hold bachelors and masters degrees in mathematics and a J.D. from Harvard Law School.  Additional biographical material, including lists of testimony and publications, is provided in Appendix A.

Hal Poret

Dated:  April 6, 2012

2

**STUDY DESIGN**

A total of 172 respondents participated in this telephone survey, in which respondents were shown and asked about the 2011 Norwood catalog to determine whether or not they mistakenly believe that the catalog comes from, or is affiliated with or approved by, All-In-One.[2] Because respondents needed to view actual materials from Marketquest, Bic, and others, the survey was conducted by calling relevant consumers on the telephone and having them look at materials on their computer screen while they were being interviewed.

The survey format utilized is often called a Sequential Lineup Survey.[3]  A sequential lineup survey simulates consumer exposure to the senior user's mark (ALL-IN-ONE) followed by marketplace exposure to the junior user, as well as others.  This design was appropriate in this case because both parties sell customizable promotional products. Accordingly, it is realistic that a prospective purchaser of customizable promotional products could come across multiple companies that sell such products in the course of considering a purchase.  Specifically, it is realistic for the survey to simulate that a consumer who is interested in purchasing customized promotional items is exposed to Marketquest's use of ALL-IN-ONE and also encounters the Norwood catalog, as well as other catalogs in the course of considering a purchase.[4]

As laid out in more detail below, the survey involved: (1) first showing respondents the ALL-IN-ONE website; (2) then showing respondents parts of four catalogs offering customizable promotional products, one of which was the 2011 Norwood Catalog; and

---

[2] See Relevant Universe and Sampling sections below for more specific information on how respondents were identified and selected for participation in the survey.  As discussed in more detail below, the survey universe consisted of prospective end purchasers of customizable promotional products – i.e., individuals who are involved in decisions about ordering customizable promotional products for their business or organization.  Distributors of such products were not part of the survey universe.
[3] McCarthy on Trademarks and Unfair Competition 32:177.
[4] It is my understanding that distributors often show catalogs to prospective end purchasers of customizable promotional products.

3

(3) asking respondents about each catalog to see if they mistakenly connect it to the ALL-IN-ONE website and, if so, why.  Specifically, the purpose of this was to determine if respondents mistakenly connect the Norwood Catalog to ALL-IN-ONE because of the use of the words All in ONE on the Norwood Catalog.

The All-In-One website was an appropriate way to expose respondents to the ALL-IN-ONE mark.  The All-in-One website is one of the significant ways in which Marketquest uses the mark with prospective consumers.  The mark appears in the domain name as well as in numerous places on the website.  In Marketquest's motion for a preliminary injunction, Marketquest touted its advertising of the mark on the internet and emphasizes that it competes for customers over the internet.  Accordingly, having respondents view the All-In-One website was a fair and realistic way to simulate a prospective consumer's encounter with the mark.

Showing respondents the 2011 Norwood Catalog was the appropriate way to test for confusion as that is where the allegedly infringing use appeared.

It was standard and appropriate to also show and ask respondents about three other catalogs offering competing products – catalogs from Jetline, Quickpoint and Bullet. Showing multiple catalogs simulated a realistic process of consumers considering multiple options for purchasing customizable promotional products, and reduced the suggestiveness of a connection between any two companies involved in the survey.  As discussed in more detail below, these other three catalogs also served as controls for measuring the survey noise level.

After completing the screening portion of the survey, all qualified respondents were asked to go to a computer with internet access.  They were then instructed as follows:

4

In a moment I am going to direct you to an image of a website from a company that offers customizable promotional items.  It is an actual website but the site will not be live so you will not be able to click on any links within the site.

I'll then ask you to look at the website as you ordinarily would if considering purchasing customized promotional items.  Please scroll up and down as necessary to view the entire web pages as you ordinarily would when browsing a website.

If later in the survey I ask you about the website you saw earlier, this is the website that I am referencing.

When you are finished, I will ask you take a look at a few more images and will ask you some questions.

If any image appears larger than your screen, please scroll up and down to see the full image.

If, for any question you are asked, you have no opinion, please indicate so. Please do not guess.

When respondents were ready, they were then instructed to go to the address for one of four websites on which the materials they needed to see as part of the survey were hosted.  The only difference in the four websites was the order in which the four catalogs were shown.  The websites were programmed so that respondent would advance from one screen to the next by clicking a button when instructed by the interviewer.  Roughly one-fourth of respondents were asked to go to each of the four websites.

For all versions of the website, the first page of the site was the ALL-IN-ONE homepage.[5]  Shown below is the top portion of the first page shown to respondents.   In the actual survey, the full webpage was presented, and respondents could scroll down to see the bottom portion.



---

[5] http://www.allinoneline.com/.  All images shown in the body of this report necessarily appear smaller than on a computer screen because they have to be fitted onto a page.  When viewed on a computer screen, the webpages appeared as they would when normally browsing the web.

When the website had loaded, respondents were asked if they could see the website clearly, and needed to confirm that they could before continuing.  Respondents were then instructed:

> Please take your time looking at this home page and let me know when you are ready.

When respondents had taken enough time to look at the home page, they were then instructed to click the button to advance to the next screen, which was the INFO page from the ALL-IN-ONE website:[6]

---

[6] http://www.allinoneline.com/Info.aspx.  Respondents in the actual survey were shown the entire page.



They were then instructed:

> You are now looking at the "INFO" page from the same website.  Please take your time looking at this page and let me know when you are ready.

By showing both the home page and the info page from the ALL-IN-ONE website, respondents were given a fair and realistic exposure to the website, the products offered, and the use of the name ALL-IN-ONE.  The Home and Info pages show the

8

name ALL-IN-ONE over 30 times, including in the heading at the top of the page.  The name "allinone" also appeared in the web address shown above the web pages in the browser.

After respondents finished reviewing the INFO page, they were instructed to advance to the next screen, which showed a stop sign, asking respondents not to advance to the next screen yet.  Respondents were then instructed:

> Now I'd like to show you images of several catalogs containing customizable promotional items.  You will see six pages from each catalog to give you a sense of the catalog, although the complete catalogs contain many more pages.

> Please click "continue" to see the first of the catalogs.  Please take your time looking at six pages of this catalog.  Please adjust your web browser or scroll as necessary to see each full page.

> When you are finished viewing this catalog you should see a page that reads, "Stop here until instructed to continue." Please let me know when you arrive at this page.

For respondents viewing Website #1, the Norwood catalog appeared first.  The first page shown from the Norwood catalog was the cover:

9



The second page shown from the Norwood catalog was the first page:

**NORWOOD**

## ALL in **ONE** CATALOG

### Our complete product resource guide!

- Writing Instruments
- Meeting
- Office
- Technology
- Bags
- Travel
- Outdoor & Leisure
- Fun
- Golf
- Drinkware
- Housewares
- Flashlights, Tools & Auto
- Health, Wellness & Safety
- Awards & Recognition



### Introducing our 2011 collection of Norwood catalogs:



Best of Norwood Catalog
**(Canadian version available)**



Calendars, Planners & Diaries Catalog



Good Value Calendars® Catalog

Exciting changes are in store for the Norwood brand in 2011! Foremost amongst these changes is our move to a Global Brand as our products are now available in more than 35 countries around the world. As part of our continued focus on simplifying our business to best serve your needs, we have consolidated our catalogs to make finding the perfect promotional product solution that much easier.

**NEW! Norwood All in ONE Catalog**
Our primary product resource, featuring all product lines in ONE catalog. We are also proud to announce the addition of Atchison® branded bags to our Norwood bag collection.

**Norwood Calendars, Planners & Diaries Catalog**
Our full-line calendars catalog featuring a wide range of dated calendar styles, planners and diaries.

**Best of Norwood Catalog**
The best of the best, showcasing items across all product categories.

**Norwood Good Value Calendars® Catalog**
Our value priced range of proven best-selling calendar styles, including appointment calendars, mini calendars and business essentials.

Norwood continues to offer all the products and services you have come to rely on, such as Free 24-Hour Service on many of our products and goingreen®, our line of eco-conscious promotional products. Furthermore, Norwood.com continues to evolve and now features even more product videos, updated iCatalog® and Safety Search™ - our exclusive library of product safety testing reports.

We thank you for your business and look forward to providing a positive Norwood experience to you in the coming year and beyond.

Sincerely,

Quenten Wentworth
Vice President/General Manager

www.norwood.com    1

11

These pages were shown because they are the pages where "All in ONE" appears on/in the Norwood catalog.  The other four pages shown were the following:



NORWOOD.

# TABLE OF CONTENTS

| TECHNOLOGY | 136–145 |
|---|---|
| USB's | 138–140 |
| Electronics | 141–145 |

| WRITING INSTRUMENTS | 8–71 |
|---|---|
| Pens less than $0.50 | 10–28 |
| Pens $0.50 – $1.50 | 29–57 |
| Gift Pens | 58–66 |
| Highlighters, Pencils & Erasers | 67–71 |

| BAGS | 146–229 |
|---|---|
| Totes | 148–167 |
| Backpacks | 168–183 |
| Briefcases | 184–201 |
| Duffels | 202–212 |
| Coolers | 213–229 |

| MEETING | 72–97 |
|---|---|
| Folders | 74–76 |
| Jotters | 77–80 |
| Juniors | 81–86 |
| Padfolios | 87–97 |

| TRAVEL | 230–241 |
|---|---|
| Travel Accessories | 232–238 |
| Utility Kits | 239 |
| Luggage | 240–241 |

| OFFICE | 98–135 |
|---|---|
| Badge Holders & Lanyards | 100–106 |
| Clips | 107–112 |
| Desk Accessories | 113–131 |
| Photo Frames | 132–135 |

| OUTDOOR & LEISURE | 242–259 |
|---|---|
| Chairs & Stadium Seats | 244–247 |
| Blankets | 248–249 |
| Hard Sided Coolers | 250 |
| Picnic & BBQ | 251 |
| Headwear | 252–259 |

TABLE OF CONTENTS

ABOUT NORWOOD





**NORWOOD**

**55128**
**Comfort Stick Frosted Pen**
Mechanism: Stick
Material: Plastic
Product Size: 5-3/4"l x 5/16" dia.
Decoration Method/Area:
Screen Print; Barrel; max. 1 color

Barrel 1-3/4"w x 3/4"h

525 = 7 lbs (approx.)/Bulk   M ●

Optional blue ink available in blue pen only
Black ink will be provided unless specified

Purple   Red   Yellow   Black   Blue   Green

**55127**
**Comfort Stick with Grip Pen**
Mechanism: Stick
Material: Plastic
Product Size: 5-3/4"l x 5/16" dia.
Decoration Method/Area:
Screen Print; Barrel; max. 1 color

Barrel 1-3/4"w x 3/4"h

525 = 7 lbs (approx.)/Bulk   M ●

Optional blue ink available in blue trimmed pen only
Black ink will be provided unless specified

Set-Up Charge: FREE
Production Time: 4 business days

| QTY | 500 | 1000 | 2500 | 5000 | 10000 | |
|-----|-----|------|------|------|-------|---|
| 55128 | $0.44 | 0.41 | 0.37 | 0.35 | 0.28 | 5C |
| 55127 | $0.44 | 0.41 | 0.37 | 0.35 | 0.28 | 5C |

Price includes 1-color imprint. 1 location

Purple   Red   Green   Blue   Black

PENS LESS THAN $0.50

WRITING INSTRUMENTS

(i) pgs 606 - 614

Please refer to page 4 for icon definitions.
www.norwood.com   **11**

14



# General Information

## Production-Ready Order

Please see order checklist on the inside back cover to help avoid delays.

### Standard Production Times

Standard production times vary by product – see product pages for information. Seasonal fluctuations and size of order may affect production times. Production time begins the day after all clarifications have been made and your order is considered production-ready. See Production-Ready Order section for requirements.

## Production-Ready Art

We accept high-quality laser prints or digital art on CDs or by e-mail. For faster service and better imprint quality, we recommend providing artwork via e-mail. Artwork should not need any additional touch-up, design, color separation or rearranging for use.

The use of licensed artwork requires a written release. Artwork when submitted is assumed to be in full compliance with laws governing copyrights, trademarks, etc. We are not responsible for typographical errors incorporated in submitted artwork. Factory reserves the right to make slight alterations in copy and logos to adapt to imprinting processes.

### Electronic Artwork

CD: Artwork will be accepted digitally from the following programs:
- Adobe® Illustrator® (any version, PC or Mac with all fonts converted to outlines) – preferred format
- Photoshop© (black-and-white .tiff, .pict, .jpeg files) scanned or created at 1200 dpi (high resolution) and at approximately the actual size of the imprint area
- FreeHand (saved as an Illustrator ".ai" format, Mac or PC)
- Quark® or InDesign© files must be sent with the linked file. A linked file may include .eps, .pict, .tiff, or .jpeg file formats
- CorelDraw® (Using the "export" function, select "Adobe Illustrator .ai" format and the "Convert Type to Curves" option (placed/imported images do not convert; include as separate files and not embedded)
- For personalization (select items) submit list of names with the following file extensions: Excel: .xls or Comma Delimited Text: .csv
- Submit a copy of the art layout with the order

E-mail Artwork: Artwork should be submitted within 24 hours of sending the order. Please include purchase order number in the subject line of the e-mail. Multiple files should be compressed in either .zip or .sit format. File size limitation when sent via e-mail is 10MB. Artwork can also be transferred directly to us via our online art transfer system.

### Hard Copy Artwork

If electronic art is not available, please provide sharp, high-contrast, color-separated or black-and-white artwork. Artwork will be returned upon request or it will be discarded.

Please Note: Norwood reserves the right not to print any logo or message that is deemed inappropriate.

### Raster Art (Placed/Continuous Tone Images)

Raster Art is "resolution dependent". When you change the size of an imprint, you change the quality. This means that the resolution (dpi or ppi) of your file is critical. Files must be at least 300 dpi at 100% of final size.

Grayscale and Bitmaps must be 1200 dpi. Do not submit files with linked images. Please embed all graphics.

### Standard Font Types

**Sans Serif**
Avant Garde Demi 1234567890
Eurostyle Bold 1234567890
Futura Bold 1234567890
Helvetica Bold 1234567890
Helvetica Black 1234567890
Helvetica Condensed Bold 1234567890
News Gothic Bold 1234567890
Optima Bold 1234567890
Univers Bold 1234567890
Univers Black 1234567890
Univers Bold Condensed 1234567890

**Script**
Brush Script 1234567890
Engravers Old English 1234567890
Kaufmann Bold 1234567890
Zapf Chancery 1234567890

**Serif**
Aachen Bold 1234567890
Bembo Bold 1234567890
Benguiat Bold 1234567890
Garamond 1234567890
Friz Quadrata Bold 1234567890
Impressum Bold 1234567890
Palatino Bold 1234567890
Rockwell Bold 1234567890
Souvenir Demi 1234567890
Souvenir Demi Italic 1234567890
Times Ten Bold 1234567890

### Standard Engraving Types for Personalization

Times 1234567890
Snell 1234567890

### Standard Imprint Colors

#### New Stock Imprint Color Palette



| Black | White | Red 186 | Maroon 202 | Burgundy* 208 |
|---|---|---|---|---|
| Magenta* 205 | Pink* 211 | Cream* 1345 | Orange 172 | Yellow Process |
| Athletic Gold* 116 | Teal* 327 | Dark Teal* 316 | Green 355 | Forest Green* 341 |

GENERAL INFORMATION

15

All catalog pages depicted in this report appeared larger on a computer screen and were high quality images that were easy to view and read.

The purpose of showing these additional four pages was to give respondents a fair sense of the catalog and the products offered.  Showing six total pages gave respondents a fair sense of the catalog and products and a full exposure to its use of All-in-ONE.  The full catalogs are too long to have asked respondents to review entire catalogs.  If anything, showing only six pages <u>overemphasized</u> the appearance of the words "All in ONE" because those words appeared on 2 of the 6 pages shown rather than 2 of many more pages in the full catalog.

After respondents were finished viewing the first catalog, they were asked to click a button to advance to view the next catalog, and so on until they had reviewed all four catalogs.  For each of the other three catalogs, six pages were shown to be consistent with how the Norwood catalog was presented.[7]  The order in which the catalogs were shown differed across the four websites, so that the Norwood catalog was shown in a different position for each one.[8]

Respondents were then instructed that they would be asked a question about each of the four catalogs.  They were then instructed to click continue to see the cover of the first catalog again.  For respondents viewing Website #1, the next screen showed the cover of the Norwood catalog again.  The purpose of showing the cover of the catalog again was so that respondents would be clear about which catalog they were being asked about.  The cover (which includes the words All in ONE) was on the screen while respondents were asked the following:

---

[7] <u>See</u> Appendices F - H for webpages showing the catalogs.  <u>See</u> Appendix B for the complete text of the survey instructions and questions.

[8] Website 1 showed the websites in the following order: Norwood, Quickpoint, Bullet, Jetline. Website 2: Bullet, Norwood, Jetline, Quickpoint; Website 3: Quickpoint, Jetline, Norwood, Bullet; Website 4: Jetline, Bullet, Quickpoint, Norwood.

Do you believe this catalog and the <u>website</u> you saw earlier in this survey are from the same company, or from different companies, or don't you know?

If respondents answered that the catalog and the ALL-IN-ONE website are from the same company, they were next asked:

What makes you think this catalog and the website you saw earlier are from the same company?

The purpose of this question was to determine whether or not the words "All in ONE" were the reason that respondents answered that the Norwood Catalog is from the same company as the ALL-IN-ONE website.

Respondents who had answered "different companies" or "don't know" to the first question about the catalog were instead asked a second question:

Do you think the company that this catalog is from is <u>affiliated with</u> or <u>received approval from</u> the company whose website you saw earlier in this survey, or do you think not, or don't you know?

Respondents who answered in the affirmative were next asked:

What makes you think the company that this catalog is from is <u>affiliated with</u> or <u>received approval from</u> the company whose website you saw earlier in this survey?

The purpose of this question was to determine whether or not the words "All in ONE" were the reason that respondents answered that the Norwood Catalog is from  a company that is affiliated with or approved by the company that the ALL-IN-ONE website is from.

17

The two question series described above permitted the survey to cover a variety of forms of confusion recognized by the Lanham Act – confusion as to source, affiliation and approval.

After respondents were asked about the first catalog, they were then instructed to click to advance to the next screen, which showed the cover of the second catalog again. Respondents were then asked the same questions described above about the second catalog.  This continued until respondents had been shown and asked about all four catalogs.

The survey incorporated two methods for controlling for survey noise – i.e., the tendency of respondents to connect a customizable promotional products catalog to  the ALL-IN-ONE website for reasons unrelated to trademark confusion.  There are many reasons a survey respondent might answer  that a catalog comes from the same company as a website, such as the style, colors, fonts or designs of the materials, the fact that they both offer similar products, a general belief that various companies in the same field are affiliated, or general agreement bias or guessing.  Accordingly, it is important to control for these forms of noise so that survey responses are only counted as indicating potential "confusion" if they are caused by the allegedly infringing trademark use.

One method for controlling for noise was the use of the follow-up questions(depicted above), through which respondents who connected a catalog to the ALL-IN-ONE website were asked their reasons for making that connection.  If respondents' reason includes the use of the words "All in ONE," the answer indicates potential  trademark confusion.  If respondents only give unrelated reasons, the answer is noise that cannot be attributed to the use of "All in ONE."  Accordingly, the "reasons" questions function as control questions.

18

The second method for controlling for noise was the inclusion of the three other catalogs.  By asking about comparable catalogs from competitors that do <u>not</u> use the term "All in ONE," the survey noise level can be estimated.  If the percentage of respondents connecting the Norwood catalog to ALL-IN-ONE significantly exceeds the percentage for other catalogs, this would indicate that the Norwood Catalog's use of All in ONE causes confusion.  If, on the other hand, the percentages are comparable, this would indicate that the use of All in One is a negligible factor and that any pattern of connecting the Norwood Catalog to ALL-IN-ONE is caused by other factors.

A third form of controlling for noise was also originally contemplated.  A Control Group was designed in which respondents would have taken the same survey with the sole exception that the words "All in ONE" were removed from the Norwood Catalog.  The purpose of this would have been similar to the purpose of asking about the third party catalogs – to determine the percentage of respondents who connect a catalog like the Norwood Catalog to ALL-IN-ONE even in the absence of any allegedly similar trademark use.  As discussed in more detail below, however, the results of the main survey showed only a negligible level of potential confusion relating to the use of "All in ONE" on the Norwood catalog.  Accordingly, there would have been no purpose in running a Control Group, whose only role would have been to <u>discount</u> the Test Group's estimate of potential confusion to account for noise.  Because the level of potential confusion was so low to begin with, the other two methods of controlling for noise were more than sufficient.[9]

---

[9] The Control websites were programmed, using images of the Norwood Catalog in which the words "All in ONE" had been digitally removed. These are provided as Appendix G. However, when I reviewed the results in the Test Group and saw that only a handful of respondents mentioned the use of "All in ONE" on the Norwood Catalog, it was clear that the confusion level was negligible and that a third form of control (the Control Group) was unnecessary.  Accordingly, I did not implement the Control Group.

The sample size of 172 was sufficient to ensure a reliable result.  As discussed in more detail below,  the margin of error for the survey result was only approximately 3% at a 95% confidence interval.

## *SUMMARY OF KEY FINDINGS*

1.   A total of 30.2% of respondents answered that the Norwood Catalog is from the same company as the ALL-IN-ONE website and an additional 5.3% answered that the Norwood Catalog is from a company that is affiliated with or received approval from the company the ALL-IN-ONE website is from, a total of 35.5%. Only 8 of these respondents (4.7% of the survey), however, mentioned the name All in ONE as a reason for connecting the Norwood Catalog to the ALL-IN-ONE website. The remaining 30.8% is survey noise – answers that are unrelated to trademark similarity. Accordingly, this indicates a rate of 4.7% potential trademark confusion. Confusion levels in this range are typically considered *de minimis.*

2.   Comparable to the 35.5% overall rate for the Norwood Catalog, the following percentages of respondents connected the other catalogs to the ALL-IN-ONE website: Quickpoint (33.1%), Bullet (32.0%), Jetline (30.8%). As the rate for the Norwood Catalog only exceeds the 32.0% average of the other results by a negligible margin (3.5%), this confirms that the rate of trademark confusion is below 5% and that the rest is survey noise – i.e., respondents connecting a catalog and a website because they sell similar products or because of other similarities unrelated to the use of "All in ONE."

3.   Based on the survey results, it is my opinion that there is not a likelihood of confusion caused by the use of the words "All in ONE" on the 2011 Norwood Catalog.

See Detailed Findings section below for additional information on results. The full data will be provided in electronic form.

21

## *METHODOLOGY*

**THE RELEVANT UNIVERSE OF INTEREST**

The relevant universe for the survey was defined as actual and prospective purchasers of customized promotional products, as that is the universe that might have encountered the Norwood Catalog.  It is my understanding that two segments of potential customers could be exposed to catalogs of customizable promotional products: (a) distributors of customizable promotional products; and (b) end consumers who purchase such products from the distributors for their business or organization.  In Marketquest's motion for preliminary injunction, Marketquest did not specify who it believed was likely to be confused, but seemed to be contemplating confusion among both distributors and end consumers.

For several reasons, the survey covered the universe of end consumers, not distributors.  First, it is typically the case that end users are <u>more likely</u> to be confused about a purchase than distributors.  End users tend to be less sophisticated about the customizable promotional items industry and may be making a purchase decision based on limited review of a catalog or website or discussions with a distributor.  Distributors, on the other hand, tend to be more sophisticated about their industry and are entering into a major transaction when they contract to distribute products for a company.  It is typically much less likely that a distributor would be confused about what company they are contracting with to distribute products (or that they would fail to clarify any momentary confusion in the course of interacting with the company whose products they are distributing).  Accordingly, it made more sense to survey end users, because if end users are not confused, it would be unlikely that the more sophisticated distributors would be confused.

In addition, distributors of customizable promotional products constitute a small universe compared to end purchasers of such products.  It was not clear that a

22

sufficiently large number of distributors could be reached during the available time period in order to have a reliable sample of distributors.  On the other hand, the universe of end purchasers of such products is large, and reaching and interviewing a sufficiently large sample of such consumers was highly feasible.

In order to reach prospective end consumers of customizable promotional products, businesses and organizations were contacted (as discussed below in the Sampling section).  In order to find an appropriate respondent, the telephone interviewer asked to speak with an individual who would be responsible for purchasing customizable promotional items, if any.  Once a potential respondent was on the line, the respondent was instructed as follows:

> I'm now going to ask if you have personally been involved in purchasing certain items for your company or business.  When I say <u>involved</u>, I mean that you personally make decisions or participate with others in making decisions about what to purchase.

In order to ensure the respondent was qualified to take the survey, they were then asked:

> First, have you ever been personally involved in purchasing customized promotional items for your company or business?  I'm talking about promotional items that are customized with the name or logo of your company or business, or some other customized message -- items such as pens, mugs, flash drives, or other office or computer-related accessories.

If the respondent answered "yes" – that they have been personally involved in purchasing customized promotional items – they were qualified to take the survey.  If not, they were asked:

23

In the next 12 months, are you likely to be involved in purchasing customized promotional items for your company or business?

If the respondent answered that they are likely to be involved in purchasing customized promotional items in the next 12 months, they were qualified to take the survey.[10]

Respondents were then asked several questions for classification purposes: (1) what industry they work in; (2) what is their job title; (3) how many people are employed by their company; (4) when they most recently were involved in purchasing customized promotional items;[11] and (5) what types of customized promotional items they have been personally involved in purchasing. These questions did not determine eligibility for the survey but provided us information regarding the respondents.

The actual wording of all screening and classification questions used is shown in Appendix B.

---

[10] All but two of the respondents qualified on the basis of having already been personally involved in purchasing promotional items. The other two had not personally been involved previously but indicated they were likely to be personally involved in purchasing customizable promotional items in the next 12 months.

[11] 142 of the 172 respondents (82.6%) have been personally involved in purchasing customizable promotional items within the past 12 months, 13 were most recently involved in purchased between 1 and 2 years ago, three between 2 and 3 years agoand 11 more than 3 years ago. One respondent was not sure and the other two (noted above) had not previously purchased.

24

**SAMPLING PLAN**

The sampling plan involved using three types of random national sample universes of organizations that could be prospective purchasers of customized promotional items. In all cases, records were de-duplicated to assure there was no over-lap between databases. Additionally, any government organizations included in the databases were removed. The four sample sources used in the survey were:

**(1) National Mid-Large Company Database:**

A total of 10,504 randomly selected records, targeted at both mid-large sized companies (defined as those with 100+ employees) and small business establishments (defined as those with under 100 employees) were obtained from InfoUSA, a national provider of business databases. InfoUSA is a leading supplier of sample for market research purposes. This was the first database secured and was a random cross-section of US companies. The overall incidence of qualification among organizations reached through this database was approximately 5% -- in other words, approximately 5 out of every 100 companies contacted were qualified prospective purchasers of customized promotional items. A total of 39 of the 172 completed interviews came from this database.

**(2) National Yellow Page Advertiser Database:**

In order to more precisely target the types of businesses that are likely to purchase customized promotional items, a total of 3,931 random records targeted at businesses that advertise in any way in yellow pages was also secured from InfoUSA. Organizations that advertise in yellow pages were thought to be somewhat more likely to purchase promotional items. This turned out to be correct, as the overall incidence of qualification among this sample was approximately 8%. A total of 33 of the 172 completed interviews came from this database.

25

**(3)  National On-Line search/clerically developed database of Yellow Page Advertiser Database:**

An additional total of 13,046 random records, also targeted at businesses that actively advertise in yellow pages, was secured clerically by searching various on-line publically available sources.  Such sources include www.yellowpages.com, www.yellowbook.com  and www.yellowpages.aol.com.  This database targeted a broad base of companies that actively advertise, focusing on small regional businesses such as car dealerships, banks, credit unions, brokerage firms, hospitals and health care (doctors, dentists, etc), insurance agencies, computer/technology support/repair businesses, law offices, plumbing/heating/HVAC  and other businesses.  The overall incidence of qualification among this database was approximately 11%.  A total of 111 of the 172 completed interviews came from this list.

It is standard and well-accepted procedure in the field of market research to conduct business-to-business surveys by using such databases – random selections of US companies generally or random selections of businesses listed in yellow pages or similar sources.

Quotas were established in order to represent small, medium and large-sized businesses in the survey.  Small businesses were most heavily represented, followed by medium-sized businesses, as this mirrors the marketplace reality that most businesses are small to medium-sized.  The following number of interviews were completed within each size:

| Size (# of employees) | Number of completed interviews |
|---|---|
| Fewer than 10 employees | 85 |
| 10 to 99 employees | 77 |

| 100 or more employees | 20 |
|---|---|

Telephone surveys are well-accepted in the field of survey research as a standard, reliable methodology. Indeed, telephone surveys are among the most common methods of conducting market research among businesses and organizations. Businesses and other organizations routinely make decisions of importance based on the results of telephone survey research, and telephone surveys have been accepted in evidence in numerous U.S. District Court proceedings.

Opinion America, a professional telephone interviewing organization, programmed the survey and conducted the telephone calls.[12]  The survey was programmed so that all instructions, questions, and answer choices automatically appeared on the interviewer's monitor at the appropriate time, and all answers were recorded directly into a computer database.

The age and gender of individual respondents participating in the survey was as follows:

| Age | Number of completed interviews |
|---|---|
| 18 to 34 | 39 |
| 35 to 49 | 71 |
| 50+ | 60 |
| Did not provide age | 2 |

| Gender | Number of completed interviews |
|---|---|
| Male | 85 |
| Female | 87 |

---

[12] A Disposition Report showing statistics regarding the telephone calls made is included in Appendix B.

Most participants in the survey were business owners, presidents or managers, and individuals with positions in marketing, promotions, and human resources.  The following table shows the most common positions or job titles held by respondents:

| Position | Number of completed interviews |
|---|---|
| Manager | 64 |
| Owner | 47 |
| Marketing/Promotions/HR | 36 |
| President/VP | 17 |

## DOUBLE-BLIND INTERVIEWING

The study was administered under "double-blind" conditions.  That is, not only were the respondents kept uninformed as to the purpose and sponsorship of the study, but the service (Opinion America Group) involved in providing the sample and administering the online interviews was similarly "blind" with respect to the study's purpose and sponsorship.

## INTERVIEWING PROCEDURES

Screenings for eligibility and interviews were conducted from a central location telephone facility run by Opinion America Group.  Respondents were screened and interviewed by well-trained and experienced professional telephone interviewers.  All interviewers were briefed on the study by a supervisor and required to conduct practice interviews before beginning the survey.  Throughout the assignment, tight control and supervision was maintained over all aspects of the interviewing.  The survey instructions and questions were provided to Opinion America Group and programmed for CATI-Web interviewing.  This means that all the questions and instructions

28

automatically appeared on the interviewers' monitors and respondents' answers were recorded directly into the computer.  My staff and I thoroughly checked the computer program before the launch of the study to determine that all the instructions and questions functioned properly.  A member of my staff also listened in on interviews to ensure quality and validity of the survey.  A portion of each interviewer's work was also monitored by an Opinion America supervisor.

Additionally, a representative from the interviewing facility regularly contacted an ORC International representative with progress reports and data updates.  This allowed us to closely monitor and supervise the progress of the study.

## DATA PROCESSING

Data was collected by Opinion America Group and made available to ORC International in Excel format.  The data set showing each respondent's answers to all questions will be provided in electronic form.

## INTERVIEWING PERIOD

Interviewing was conducted from February 29, 2012 through April 4, 2012.

29

## *DETAILED FINDINGS*

### I.  RESULTS FOR NORWOOD CATALOG

Of the 172 respondents who were shown and asked about the Norwood Catalog, 52 answered that it comes from the same company as the ALL-IN-ONE website.

An additional 9 respondents answered that the Norwood Catalog comes from a company that is affiliated with or received approval from the company the ALL-IN-ONE website is from.

| **NORWOOD CATALOG (BASE = 172)** | **%** |
|---|---|
| Same company | 30.2% |
| Affiliated/Approved | 5.3% |
| **TOTAL** | 35.5% |

The answers of these 61 respondents were examined to determine whether the use of "All in ONE" on the Norwood Catalog played any role in their belief that the Norwood Catalog is from the same company as (or a company that is affiliated with or approved by) ALL-IN-ONE.

When asked for their reasons, only 8 respondents(4.7%) mentioned the name ALL-IN-ONE or gave any other answer that might be a reference to the name ALL-IN-ONE. The following are the ID numbers of these respondents and their stated reasons for connecting the Norwood catalog to the ALL-IN-ONE website.

| Respondent ID # | Potentially Confused Response |
|---|---|
| 150612 | Just the same name. |
| 150614 | When I saw all in one" reminded me of the first page columns on the left and products in the front. |
| 150698 | Says All in One. I had seen it in the other pages also. |
| 151037 | The fact that it said All in one on it. |
| 151076 | Its got the all in one like the website. |
| 200182 | They both sell all in one products. |
| 200318 | Says all in one. |
| 200358 | It says all in one. |

Three other respondents mentioned the "name" or "title" in their answer, but do not appear to be referring to "All in One."  Respondent 100301 answered that "the title is the same" but I do not believe this was a reference to "All in One" because this respondent also gave the same answer about the Bullet catalog.  In addition, this respondent answered that all four catalogs come from the same company as the ALL-IN-ONE website, which indicates this respondent was mainly guessing.  Respondents 150046 and 150080 also both referred to the "name" but also did so in response to one or more of the other catalogs, indicating they were thinking of something other than the name ALL-IN-ONE.  Even if these three respondents were counted as confused due to the use of "All in One," the result would only change from 4.7% to 6.4%.

The remaining 50 respondents gave answers that were unrelated to the use of "All in One" on the Norwood Catalog.

31

| Resp.  ID # | Non-Confused Response |
|---|---|
| 100012 | The color scheme matches throughout all the pages. |
| 100098 | It looks the same. |
| 100109 | All published together. |
| 100114 | They look identical. |
| 100214 | Same as before i think they got approval from A.S.I. and they have all of this info available |
| 100336 | Way it's laid out. |
| 100343 | Looks familiar. |
| 100348 | It seems the impact of the photos in front it could be the color. |
| 100382 | Same thing sold. |
| 100399 | Because she saw the two zee in the middle and generally looks like it was laid out the same way. |
| 100415 | Items are the same that are showing on website. |
| 100423 | The pictures. |
| 100520 | Again, the same basic vernicular style and layout. Background colors etc. |
| 100694 | All the special orders are written the same way it was before/shipping and everything was the same. |
| 100728 | The items; the pens, flashlight, and golf balls are the same. |
| 150003 | They look the same. |
| 150017 | Different layouts and formats like before. |
| 150019 | Same items. |
| 150045 | This one looks very professionally done. |
| 150061 | The Coloring and some of the same materials. |
| 150093 | I think it is a good way for me to see the catalog and I am still new to this catalog. |
| 150129 | The  layout. |
| 150149 | Same designs and colors of the layout. |
| 150236 | The items they have. |
| 150269 | Styling, color |
| 150302 | They seem to carry Similar item. |

| 150311 | Layout, colors and it's more clear. |
| 150318 | A lot of the same items in both sights, Ink pens and same style. |
| 150368 | I would assume its affiliated with ASI. |
| 150375 | Similar products and brands and of course the layout and design of the adds. |
| 150387 | A lot of the same products and colors. |
| 150454 | Same offering set, same kind of pens, key chains, golf balls, etc. |
| 150457 | The quality of the website and products. |
| 150501 | I think all 4 catalogs are from different companies but the website handled all 4 catalogs. |
| 150671 | The raw look of the page. |
| 150732 | Norwood layout not busy-neat way. |
| 150755 | Not sure it just looks the same. |
| 150776 | They sell the same product the flash drive caught my eye. |
| 150809 | The same type. |
| 150854 | It just looks the same. |
| 150959 | They are both overly cluttered. Over use of color. |
| 151031 | Again the same colors and the fact that they have similar pens and flash drives as the first web site. |
| 200150 | Colors and layout and font are similar-using same colors. |
| 200160 | I thought that both are very easy and clear to read plus the colors and organization are the same as well. |
| 200183 | Similar layout and coloring pattern. |
| 200268 | General design. |
| 200283 | Graphics look the same. |
| 200342 | Both sell office supplies. |
| 200361 | Same website. |
| 200388 | Design style, products and design of the web site. |

As is evident from the above answers, these respondents did <u>not</u> confuse the Norwood Catalog with ALL-IN-ONE for trademark-related reasons.  Their answers were caused by other factors, such as the catalog having similar items as the website.

Accordingly, the rate of potential confusion due to the use of "All in ONE" on the Norwood Catalog based on these answers is 4.7%.  The margin of error for this result is approximately 3% at a 95% confidence interval at the sample size of 172.[13]

An analysis of respondent answers regarding the other catalogs, Jetline, Bullet, and Quickpoint, confirms the same conclusion.

The following are the percentages who answered that each of these catalogs is from the same company as (or a company that is affiliated with or approved by) ALL-IN-ONE, compared to the results for the Norwood Catalog.[14]

| <u>ALL CATALOGS</u> | <u>%</u> | Compared to Norwood |
|---|---|---|
| Norwood | 35.5% | -- |
| Jetline | 30.8% | 4.7% |
| Bullet | 32.0% | 3.5% |
| Quickpoint | 33.1% | 2.4% |
| <u>Average of Controls</u> | 32.0% | 3.5% |

As the above table shows, the rate of connecting the Norwood Catalog to ALL-IN-ONE did not meaningfully exceed the rates for comparable third party catalogs that make no allegedly similar trademark use.  The rate of 35.5% for Norwood exceeds the 32.0% average rate for the three controls by only 3.5% and only exceeds the lowest result from

---

[13] This sample size is within standard range for market research business surveys.  Increasing the survey size would not have meaningfully changed the reliability of the survey result.  Even doubling or tripling the sample size would have only changed the error rate by a 1 to 1.5 percentage points.

[14] <u>See</u> Appendix D for the complete data file showing all answers of all respondents.  For each respondent, the answers regarding the catalogs are shown in the order that respondent was asked about the catalogs based on the Cell they were in, which is indicated in the file.

the 3 controls (30.8%) by a margin of 4.7%.  Accordingly, the rates for the control catalogs confirm what the open-ended responses show -- that there is no more than a negligible rate (in the range of 3 to 5%) of trademark-related confusion caused by the use of "All in ONE" on the Norwood Catalog.

## CONCLUSIONS

Based on the survey results discussed herein, it is my opinion that the words "All in ONE" on the Norwood Catalog are not likely to have caused appreciable consumer confusion.

**APPENDIX A**

**CURRICULUM VITAE OF STUDY'S AUTHOR**

# Hal L. Poret

(hal.poret@orcinternational.com; 212-329-1018; 914-772-5087)

## *Education*

1998    Harvard Law School, J.D., *cum laude*
- Editor/Writer – Harvard Law Record
- Research Assistant to Professor Martha Minow

1995    S.U.N.Y. Albany, M.A. in Mathematics, *summa cum laude*
- Statistics
- Taught calculus/precalculus/statistics

1993    Union College, B.S. in Mathematics with honors, *magna cum laude*
- Phi Beta Kappa
- Resch Award for Achievement in Mathematical Research

## *Employment*

2004 -    Senior Vice President, ORC International (formerly Guideline)
- Designed, supervised, and analyzed over 350 consumer surveys, including Trademark, Trade Dress, Advertising Perception, Fraud/Consumer Deception, Claims Substantiation studies, Damages, and Corporate Market Research Surveys
- Provided expert testimony at deposition and/or trial regarding survey research in over 40 U.S. District Court litigations and proceedings in front of TTAB, NAD and the FTC.
- Review and comment on third party surveys

2003 – 2004    Internet Sports Advantage
- Developed and marketed proprietary internet sports product, and licensed trademark and intellectual property rights.

1998 – 2003    Attorney, Foley Hoag & Eliot, Boston, MA
- Represented corporations and individuals in trademark, trade dress, advertising, product, and related legal disputes.
- Worked with survey experts in developing and using surveys as evidence in trademark, trade dress and advertising disputes.
- Advised clients in the selection, adoption, use, licensing, and protection of trademarks/trade dress; represented clients in trademark/trade dress litigations, administrative proceedings before the Trademark Trial and Appeal Board and United States Patent and Trademark Office, and domain name proceedings under the Uniform Domain-Name Dispute-Resolution Policy.

2

*Testimony at Trial or by Deposition*

(Party who retained me shown in bold)

2011   Authors Guild v. **Google**              USDC Southern District of NY
       (Deposition)

2011   **Borghese** v. Perlier et al.           USDC Southern District of NY
       (Deposition)

2011   My Favorite Company v. **Wal-Mart**      USDC Central District of CA
       (Deposition)

2011   **Merck Eprova** v. Brookstone           USDC Southern District of NY
       (Deposition and trial)

2011   Wella, Inc. v. **Willagirl LLC**         USDC Southern District of NY
       (Deposition)

2011   Bauer Bros. v. **Nike**                  USDC Southern District of CA
       (Deposition)

2011   **Aviva Sports** v. Manley               USDC District of Minnesota
       (Deposition)

2011   **American Express** v. Black Card LLC   USDC Southern District of NY
       (Deposition)

2011   Gosmile v. **Dr. Levine**                USDC Southern District of NY
       (Preliminary Injunction Trial)

2010   **Nat'l Western Life** v. Western Nat'l Life USDC Western District of TX
       (Deposition)

2010   **3M** v. Mohan                          USDC District of Minnesota
       (Trial)

2010   Active Network v. **EA Sports**          USDC Central District of CA
       (Preliminary Injunction declaration)

2010   **FIJI Water Co.** v. FIJI Mineral USA   USDC Central District of CA
       (Deposition)

3

| | | |
|---|---|---|
| 2010 | Hansen Beverage v. **CytoSport** (Deposition) | USDC Central District of CA |
| 2010 | People's United Bank v. **PeoplesBank** (Deposition and Preliminary Injunction trial) | USDC District of CT |
| 2010 | **Don Henley** v. Charles Devore (Deposition) | USDC Central District of CA |
| 2010 | Pegasus v. **Allscripts** (Deposition and Mediation) | USDC Middle District of FL |
| 2010 | **Jelmar, Inc.** v. Zep Commercial (Deposition) | USDC Northern District of IL |
| 2010 | **Dollar Bank** v. Emigrant Bank (Deposition) | USDC Western District of PA |
| 2009 | **LG Electronics** v. Whirlpool (Deposition) | USDC District of DE |
| 2009 | **Farberware** v. Meyer Marketing (Deposition and trial) | USDC Southern District of NY |
| 2009 | **NEC** v. Ampad (Deposition) | USDC Southern District of NY |
| 2009 | **GAP Inc.** v. G.A.P. Adventures (Deposition and trial) | USDC Southern District of NY |
| 2009 | **Lumber Liquidators** v. Stone Mntn (Deposition and trial) | USDC Eastern District of VA |
| 2009 | **CytoSport** v. Vital Pharmaceuticals (Deposition) | USDC Eastern District of CA |
| 2009 | REDC v. **NHA** (Deposition) | USDC Southern District of CA |
| 2008 | 1800Contacts v. **Lens.com** (Deposition) | USDC District of UT |
| 2008 | Tokidoki v. **Fortune Dynamic** | USDC Central District of CA |

(Deposition and trial)

| 2008 | Brighton Collectibles v. **Dynasty** (Deposition) | USDC Southern District of CA |
| 2007 | **Johnson & Johnson** v. Perrigo (Deposition) | USDC Southern District of NY |
| 2007 | **Johnson & Johnson** v. Actavis Group (Deposition) | USDC Southern District of NY |
| 2007 | M.D. Skincare v. **Bare Escentuals** (Deposition) | USDC Southern District of NY |
| 2007 | Doctor's Associates v. **QIP Holders** (Preliminary injunction trial) | USDC District of CT |
| 2006 | S.C. Johnson v. **BuzzOff Insect Shield** (Deposition and trial) | USDC Middle District of NC |
| 2006 | **Wenger Corp**. v. Stadium Chair (Deposition and trial) | USDC Western District of TX |
| 2006 | **Wenger Corp**. v. Melhart Music (Deposition) | USDC Eastern District of TX |
| 2006 | **Electrolux Home Care** v. IMIG, Inc. (Deposition and trial) | USDC Eastern District of NY |

*Presentations*

Internet Survey Issues (PLI Hot Topics in Advertising Law Conference, March 2012)

Measuring Consumer Confusion Through Online Surveys (2011 Midwest IP Institute) (September, 2011)

Online Surveys as Evidence in Trademark Disputes (International Trademark Association Annual Conference, May 2011)

Managing Intellectual Property Trademark Roundtable (April 7, 2010)

Recent Trends in Trademark Surveys (Virginia State Bar Intellectual Property Conference, October 2009)

Trademark Surveys in US Litigation (presentation for International Trademark Association Annual Conference) (May 2009)

How to Conduct Surveys for use in Trademark Disputes (Practicing Law Institute Advanced Trademark Law Conference) (May 2009)

Trademark and Advertising Perception Studies for Legal Disputes (Opinion Research Corporation Seminar, June 2008)

Understanding Advertising Perception Surveys (Promotions Marketing Association Annual Law Conference) (November 2007)

Designing and Implementing Studies to Substantiate Advertising Claims (American Conference Institute Claims Substantiation Conference, October 2007)

Surveys in Trademark and False Advertising Disputes (InfoUSA Webinar, June 2007)

Measuring Consumer Perception in False Advertising and Trademark Cases, (multiple presentations) (2007)

Potential Errors to Avoid In Designing a Trademark Dilution Survey (American Intellectual Property Association paper, April 2007)

Consumer Surveys in Trademark and Advertising Cases (presentation at Promotions Marketing Association Annual Law Conference) (December 2006)

Use of Survey Research and Expert Testimony in Trademark Litigation, (International Trademark Association Annual Conference, May 2006)

<u>Survey Research as Evidence in Trademark/Trade Dress Disputes</u> (multiple presentations) (2006)

<u>Using Surveys to Measure Secondary Meaning of Trade Dress</u>, Legal Education Seminar, Boston, April 2006

## *Publications/Papers*

<u>Hot Topics in Advertising Law 2012</u> (Contributor to Practising Law Institute publication)

<u>A Comparative Empirical Analysis of Online Versus Mall and Phone Methodologies for Trademark Surveys</u>, 100 TMR 756 (May-June 2010)

<u>Recent Trends in Trademark Surveys</u> (paper for Virginia State Bar Intellectual Property conference, October 2009)

<u>Trademark Dilution Revision Act breathes new life into dilution surveys</u> (In Brief PLI website, June 2009)

<u>The Mark</u> (Survey Newsletter; three editions 2009)

<u>Hot Topics in Trademark Surveys</u> (paper for Practicing Law Institute Advanced Trademark Law Conference) (May 2009)

<u>The Mark</u> (Survey Newsletter, 2008)

<u>Trademark and Advertising Survey Report</u> (Summer 2007)

<u>Avoiding Pitfalls in Dilution Surveys under TDRA</u> (AIPLA Spring Conference, Boston, May 2007)

## *Commentary*

<u>Comment on Hotels.com case</u> (on TTABLOG.COM, July 24, 2009)

<u>Comment on Nextel v. Motorola</u> (on TTABLOG.COM, June 19, 2009)

<u>PLI All-Star Briefing Newsletter,</u> "What does the Trademark Dilution Revision Act mean for the future of Dilution Surveys?" (June 2009)

<u>Can I Get By Without a Survey</u>, Managing Intellectual Property (May 2009)

*Professional Memberships/Affiliations*

Senior Research Fellow at McCarthy Institute of IP and Technology Law's Center for Empirical Research in trademark Law

Council of American Survey Research Organizations

International Trademark Association

National Advertising Division of Council of Better Business Bureaus

**APPENDIX B**

**QUESTIONNAIRES**

| TELEPHONE PROGRAMMING: |
| --- |

8 cells: each cell will see 2 webpages (A & B) and 4 catalogs

<u>Initial quotas</u>:
20 per cell (Cells 1 – 4 only)

<u>Sets of Images</u>:
1A – website image A
1B – website image B

2A – 2F – Catalog 1 (Cells 1-4)

3A – 3F – Catalog 1 (Cells 5-8) – NOTE: Images 3C – 3F are the same as 2C – 2F; only 2A & 2B are changed and replaced by 3A & 3B

4A – 4F – Catalog 2

5A – 5F – Catalog 3

6A – 6F – Catalog 4

<u>PROGRAMMING OF WEBSITES</u>

There needs to be 8 websites, one for each Cell.  The following is the general layout of the websites, screen by screen:

--Website image A (with forward arrow button at the bottom of the screen)
--Website image B
--Stop screen
--1st catalog images A – F (each on its own screen with a forward arrow button at the bottom of each page so the respondent clicks it to go to the next page of each catalog)
--Stop screen
--2nd catalog images A – F (each on its own screen with a forward arrow button at the bottom of each page so the respondent clicks it to go to the next page of each catalog)
--Stop screen
--3rd catalog images A – F (each on its own screen with a forward arrow button at the bottom of each page so the respondent clicks it to go to the next page of each catalog)
--Stop screen
--4th catalog images A – F (each on its own screen with a forward arrow button at the bottom of each page so the respondent clicks it to go to the next page of each catalog)
--Stop screen
--1st catalog Image A (with a forward arrow button at the bottom of each page and an instruction that reads, "Please only click this forward arrow after being instructed to do so.")

10

--2nd catalog Image A (with a forward arrow button at the bottom of each page and an instruction that reads, "Please click this forward arrow after being instructed to do so.")

--3rd catalog Image A (with a forward arrow button at the bottom of each page and an instruction that reads, "Please only click this forward arrow after being instructed to do so.")

--4th catalog Image A (with a forward arrow button at the bottom of each page and an instruction that reads, "Please only click this forward arrow after being instructed to do so.")

**ROTATIONS FOR WEBSITES**

The order the 4 catalogs are presented in needs to be rotated.

In between each set of images on each website include a page that reads:

**STOP here until instructed to continue.**



**After you are instructed to continue to the next set of images, please click the forward arrow button.**

ENABLE BACK BUTTON WITHIN EACH SET OF IMAGES, BUT DISABLE BACK BUTTON ON "STOP" PAGES SO THAT RESPONDENTS CANNOT GO BACK TO PREVIOUS IMAGES OF THE WEBSITE OR CATALOGS.

TEST GROUP WEBSITES (CELLS 1 – 4)

1st website show catalogs in order: 2A-F, 4A-F, 5A-F, 6A-F (web address TBD)

2nd website show catalogs in order: 5A-F, 2A-F, 6A-F, 4A-F (web address TBD)

3rd website show catalogs in order: 4A-F, 6A-F, 2A-F, 5A-F (web address TBD)

4th website show catalogs in order:  6A-F, 5A-F, 4A-F, 2A-F (web address TBD)

CONTROL GROUP WEBSITES (CELLS 5 – 8)

5th website show catalogs in order: 3A-F, 4A-F, 5A-F, 6A-F (web address TBD)

6th website show catalogs in order: 5A-F, 3A-F, 6A-F, 4A-F (web address TBD)

7th website show catalogs in order: 4A-F, 6A-F, 3A-F, 5A-F (web address TBD)

8th website show catalogs in order:  6A-F, 5A-F, 4A-F, 3A-F (web address TBD)

11

**Note that the only difference between websites 1 – 4 and 5-8 is that the 2A-2F catalog images are replaced by 3A-F.  However, also note that images 2C-2F are the same as 3C-3F.  So it is really only images 3A and 3B that are replacing 2A and 2B in the Control set of websites.**

| SCREENER |
|---|

S1A.   Hello, my name is _____ and I'm calling from ORC International, a market research firm.  We're conducting a short survey and would like to include the opinions of someone in your organization.  Please be assured we are <u>not</u> selling anything, nor will we ask you to sign up for anything.  We only want your opinions.  ***(Ask to speak to an individual who is responsible for purchasing promotional items that are customized with the business name or logo, such as pens, mugs, flash drives, mousepads, or other office or computer items.)***

**BASE: ANY NON-TERMINATES**
*(When speaking with potential respondent:)*
S1B.   Hello, my name is _____ and I'm calling from ORC International, a market research firm.  We're conducting a short survey and would like to include your opinions.  Please be assured we are <u>not</u> selling anything and will not ask you to sign up for anything.
1.   Willing to participate → continue
2.   Not willing → ***ask if there is someone else who has responsibility for purchasing promotional items that are customized with the business name or logo, such as pens, mugs, flash drives, mousepads, or other office or computer items.)***

**BASE: ANY NON-TERMINATES**
S2.  I'm now going to ask if you have personally been involved in purchasing certain items for your company or business.  When I say <u>involved</u>, I mean that you personally make decisions or participate with others in making decisions about what to purchase.

First, have you ever been personally involved in purchasing customized promotional items for your company or business?  I'm talking about promotional items that are customized with the name or logo of your company or business, or some other customized message -- items such as pens, mugs, flash drives, or other office or computer-related accessories.

1.   Yes
2.   No
3.   Not sure

**BASE: IF NO/NOT SURE**
S3.  In the next 12 months, are you likely to be involved in purchasing customized promotional items for your company or business?

1. Yes
2. No
3. Not sure


**BASE: NO OR NOT SURE TO S2 AND S3**

S4.    Is there someone else with whom I could speak who would have responsibility for purchasing customized promotional items for your company or business?

1. Yes **[COLLECT INFORMATION TO REACH NEW PERSON OR IF TRANSFERRED TO A NEW PERSON, THEN GO BACK TO FIRST SCREENING QUESTION]**
2. No **[THANK & TERMINATE]**


**BASE: YES TO S2 OR S3**

S5.    Great, now we have some questions for classification purposes.

In what industry do you work? *(Interviewer: select option for list below or can enter under "other" if answer does not match a pre-listed option)*

1. Accommodation and Food Services
2. Administrative Support Services
3. Advertising/Marketing
4. Agriculture, Forestry, Fishing, Hunting
5. Arts, Entertainment and Recreation
6. Automotive Services
7. Banking and Finance
8. Communications
9. Construction (heavy/special trades)
10. Education
11. Engineering Services
12. Healthcare and Social Assistance
13. Insurance
14. Legal Services
15. Manufacturing
16. Mining
17. Printing Trade
18. Public Administration/Government
19. Real Estate
20. Religious/Non-Profit Organizations
21. Research Services
22. Retail Trade
23. Technology Services
24. Telecommunications
25. Transportation and Warehousing
26. Utilities
27. Waste Management/Remediation Services
28. Wholesale Trade

13

    29. Travel
    30. Military
    31. Business Services
    32. Pharmaceutical
    33. Finance
    34. Other, please specify _____
    35. Decline to Answer

**BASE: YES TO S2 OR S3**

S6.    And, what is your job title?

    **[Record verbatim]**

**BASE: YES TO S2 OR S3**

S7.    Approximately how many people are employed by your company?
    1. Fewer than 10
    2. 10 to 99
    3. 100 or more
    4. Don't know

**BASE: YES TO S2**

S8.    When is the <u>most recent</u> time you were personally involved in purchasing customized promotional items for your company or business?  Was it…. *(Read choices)*
    1. Within the past 12 months
    2. Between 1 and 2 years ago
    3. Between 2 and 3 years ago
    4. More than 3 years ago
    5. Don't know (***don't read***)

**BASE: YES TO S2**

S9.    What <u>types </u>of customized promotional items have you been personally involved in purchasing for your company or business?
    **[READ ALOUD AND SELECT ALL THAT APPLY]**
    1. Pens or pencils
    2. Mugs or thermoses
    3. Flash drives
    4. Hats
    5. T-shirts
    6. Note pads
    7. Key chains
    8. Calculators
    9. Mouse pads or other computer items
    10. Other, please specify _____

S10. Record Respondent's Gender

    1.  Male
    2.  Female

S11. For classification purposes only, could you tell me what age range you fall into?

    1.  Under 18 -- ***thank & terminate***
    2.  18-34
    3.  35-49
    4.  50+
    5.  Refuse

S12    We would like to ask you a few more questions which would require you being at a computer to look at a web page.  It will take only a few minutes.

Are you willing to do this?
    1.  Yes -- ***continue***
    2.  No -- ***thank & terminate***

S13    Do you have access to the internet right now?
    1.  Yes -- ***skip to S15***
    2.  No -- ***continue***

S14    Can I schedule some other time for you to look at the website and answer a few questions? Again, it will take only a few minutes.
    1.  Yes -- ***schedule a call back & end survey for now***
    2.  No --  ***thank & terminate***

S15    Please go to your computer, open an internet browser and maximize it to cover the whole screen.  Let me know when your internet browser is open and maximized.

**[WAIT FOR RESPONDENT TO INDICATE THEY ARE READY AND THEN MOVE ON TO MAIN QUESTIONNAIRE.]**

MAIN QUESTIONNAIRE

Q200    In a moment I am going to direct you to an image of a website from a company that offers customizable promotional items.  It is an actual website but the site will not be live so you will not be able to click on any links within the site.

I'll then ask you to look at the website as you ordinarily would if considering purchasing customized promotional items.  Please scroll up and down as necessary to view the entire web pages as you ordinarily would when browsing a website.

If later in the survey I ask you about the website you saw earlier, this is the website that I am referencing.

When you are finished, I will ask you take a look at a few more images and will ask you some questions.

If any image appears larger than your screen, please scroll up and down to see the full image.

If, for any question you are asked, you have no opinion, please indicate so. Please do not guess.


Q220    Are you ready?
   1.  Yes
   *2.* No -- ***wait until respondent indicates they are ready and then continue with Q225***

Q225    [DIRECT RESPONDENT TO APPROPRIATE WEBPAGE FOR THEIR CELL AND ROTATION TO VIEW IMAGES.]
      1.  CELL 1 – GIVE WEB ADDRESS FOR WEBSITE 1
      2.  CELL 2 – GIVE WEB ADDRESS FOR WEBSITE 2
      3.  CELL 3 – GIVE WEB ADDRESS FOR WEBSITE 3
      4.  CELL 4 – GIVE WEB ADDRESS FOR WEBSITE 4
      5.  CELL 5 – GIVE WEB ADDRESS FOR WEBSITE 5
      6.  CELL 6 – GIVE WEB ADDRESS FOR WEBSITE 6
      7.  CELL 7 – GIVE WEB ADDRESS FOR WEBSITE 7
      8.  CELL 8 – GIVE WEB ADDRESS FOR WEBSITE 8

Q230    You should now be looking at the homepage of a website.

Can you see the website clearly?
   1.  Yes
   *2.* No -- ***WALK RESPONDENT THROUGH WEB ADDRESS AGAIN UNTIL HE/SHE CONFIRMS THEY ARE AT THE RIGHT SITE AND THEN CONTINUE WITH Q235.  IF CANNOT VIEW PAGE CLEARLY, THANK & TERMINATE.***

16

Q235    Please take your time looking at this home page and let me know when you are ready.  *[When respondent is ready, instruct them to click the button to continue to the next screen]*

Q.237   You are now looking at the "INFO" page from the same website.  Please take your time looking at this page and let me know when you are ready.  *[When respondent is ready, instruct them to click the button to continue to the next screen]*

Q.239   You should now be looking at a page with a red stop sign.  Please do not advance beyond this screen until I ask you to do so.

**BASE = ALL QUALIFIED RESPONDENTS**
**Q240**    Now I'd like to show you images of several catalogs containing customizable promotional items. You will see six pages from each catalog to give you a sense of the catalog, although the complete catalogs contain many more pages.

Please click "continue" to see the first of the catalogs.  Please take your time looking at six pages of this catalog.  Please adjust your web browser or scroll as necessary to see each full page.

When you are finished viewing this catalog you should see a page that reads, "Stop here until instructed to continue." Please let me know when you arrive at this page.

*[CONTINUE WHEN RESPONDENT INDICATES THEY HAVE VIEWED THE FIRST CATALOG.]*
*[IF RESPONDENT WAS UNABLE TO SEE THE IMAGES FOR ANY REASON, THANK AND TERMINATE.]*

**BASE = ALL QUALIFIED RESPONDENTS**
**Q241**    Now I'd like to show you the second catalog containing customizable promotional items.

Please click "continue" to see the second catalog.  Please take your time looking at the pages of this catalog.  When you are finished viewing this catalog you should see a page that reads, "Stop here until instructed to continue." Please let me know when you arrive at this page.

*[CONTINUE WHEN RESPONDENT INDICATES THEY HAVE VIEWED THE SECOND CATALOG.]*
*[IF RESPONDENT WAS UNABLE TO SEE THE IMAGES FOR ANY REASON, THANK AND TERMINATE.]*

**BASE = ALL QUALIFIED RESPONDENTS**
**Q242**    Now I'd like to show you the third catalog containing customizable promotional items.

Please click "continue" to see the third catalog.  Please take your time looking at the pages of this catalog.  When you are finished viewing this catalog you should see a page that reads, "Stop here until instructed to continue." Please let me know when you arrive at this page.

*[CONTINUE WHEN RESPONDENT INDICATES THEY HAVE VIEWED THE THIRD CATALOG.]*

*[IF RESPONDENT WAS UNABLE TO SEE THE IMAGES FOR ANY REASON, THANK AND TERMINATE.]*

**BASE = ALL QUALIFIED RESPONDENTS**

**Q243**   Now I'd like to show you the fourth catalog containing customizable promotional items.

Please click "continue" to see the fourth catalog.  Please take your time looking at the pages of this catalog.  When you are finished viewing this catalog you should see a page that reads, "Stop here until instructed to continue." Please let me know when you arrive at this page.

*[CONTINUE WHEN RESPONDENT INDICATES THEY HAVE VIEWED THE FOURTH CATALOG.]*
*[IF RESPONDENT WAS UNABLE TO SEE THE IMAGES FOR ANY REASON, THANK AND TERMINATE.]*

**BASE = ALL QUALIFIED RESPONDENTS**

Q.244   Now I'd like to ask you a question about each of the four catalogs.  Please click continue and you should see the cover of the first catalog again.

*[CONTINUE WHEN RESPONDENT INDICATES THEY ARE AT FIRST CATALOG.]*
*[IF RESPONDENT WAS UNABLE TO SEE THE IMAGES FOR ANY REASON, THANK AND TERMINATE.]*

**BASE = ALL QUALIFIED RESPONDENTS**

**Q245**   Do you believe this catalog and the <u>website</u> you saw earlier in this survey are from the same company, or from different companies, or don't you know?

1. Same company
2. Different companies
3. I don't know/No opinion

**BASE:  245=1**

**Q246**   What makes you think this catalog and the website you saw earlier are from the same company?

[INSERT LARGE TEXT BOX FOR ANSWER]

**BASE: Q245= 2 or 3**

**Q247**   Do you think the company that this catalog is from is <u>affiliated with</u> or <u>received approval from</u> the company whose website you saw earlier in this survey, or do you think not, or don't you know?

1. Yes, affiliated or received approval
2. No, <u>not</u> affiliated nor received approval

3. I don't know/No opinion

**BASE: 247=1**

**Q248**    What makes you think the company that this catalog is from is <u>affiliated with</u> or <u>received approval from</u> the company whose website you saw earlier in this survey?

[INSERT LARGE TEXT BOX FOR ANSWER]

**[PROGRAMMER: IF ALL 4 SETS OF CATALOG IMAGES HAVE BEEN ASKED ABOUT, THEN END OF SURVEY.  IF NOT, CONTINUE]**

**BASE = ALL QUALIFIED RESPONDENTS**
Q.250   Now please click continue to see the cover of the next catalog.

*[CONTINUE WHEN RESPONDENT INDICATES THEY ARE AT CATALOG.]*
*[IF RESPONDENT WAS UNABLE TO SEE THE IMAGES FOR ANY REASON, THANK AND TERMINATE.]*

**BASE = ALL QUALIFIED RESPONDENTS**
**REPEAT QUESTIONS Q245 – 248 FOR EACH OF LAST 3 CATALOG COVERS**

ORC International                                                        Job #G50-0112

625 Avenue of the Americas                                             Promo Items Study
New York, New York 10011

## INTERVIEWER INSTRUCTIONS

### OVERVIEW

This is a Computer-Assisted Telephone study among purchasers of customized promotional items.  The survey is programmed so all instructions and questions will appear on your computer monitor.

### GENERAL GUIDELINES

- Be sure you are thoroughly familiar with all survey instructions and questions prior to beginning interviewing on the study.

- Read introductions and all instructions and questions exactly as written. Do not deviate from exact wording that appears on your screen.

- Always give respondents enough time to answer questions.

### RECORDING RESPONSES

- Read questions slowly and ask respondent to slow down if you cannot record their answer quickly enough. **WE NEED EXACT VERBATIM RESPONSES**.  Capture comments exactly as respondent states them -- **never summarize or paraphrase.**

- Capture comments in the words of the respondent.  Do not say "she said…" or "she felt…" rather; just record down exactly what the respondent says.

- If respondent says, "I have already answered the question", or "same", do not write this – instead, ask them to repeat their answer and write it verbatim.

- Give respondent sufficient time to think and answer a question before continuing.

- Never reword the questions.  Simply repeat the question if the respondent indicates that she does not understand.  **DO NOT** attempt to explain any questions.

### BRIEFING SUPERVISION OF INTERVIEWING

- All interviewers will attend a briefing on the study with an Opinion America supervisor

- All interviewers will complete practice interviews prior to commencing interviewing with actual respondents

- A portion of your interviews will be monitored by an Opinion America supervisor.  In addition, a portion of your interviews will be monitored by an ORC representative.

20

```
SAMPLE DISPOSITION REPORT 05 Apr 2012  9:16 AM

For Study: G50-0112 Promotional Items Study - OAG o12010

TABLE 001

TOTAL SAMPLE DISPOSITION REPORT

BASE: TOTAL


                              TOTAL

                              =======


TOTAL SAMPLE                  27481


TOTAL COMPLETES (CP)            172



TOTAL CALLABLE SAMPLE BY TYPE (LAST

STATUS)

-----------------------------------  14182


RECORDS NOT YET CALLED (FS)      4463


 NO ANSWER                       2118


 ANSWERING MACHINE               5216


 BUSY                               1


 UNSPEC. CALLBACK                1265
```

21

```
CHANGE NUMBER                           475


AVAILABLE SAMPLE BY ATTEMPT (CS)        9075


 1 ATTEMPT MADE                         5384


 2 ATTEMPTS MADE                        2484


 3 ATTEMPTS MADE                         889


 4 ATTEMPTS MADE                         318



SUSPENDS (SU)                            209


CALLBACKS (CB)                           435


CALLBACK (CB) Left 800#                    1


CALLBACK (CB) Requested Fax                -



TOTAL DEAD SAMPLE
-----------------                      12430


BAD SAMPLE (BS)                         2194


 NONWORK                                 244
```

PAGE 1

```
              SAMPLE DISPOSITION REPORT 05 Apr 2012  9:16 AM

        For Study: G50-0112 Promotional Items Study - OAG o12010

                      TABLE 001 (continued)

                  TOTAL SAMPLE DISPOSITION REPORT

                        BASE: TOTAL


                             TOTAL

                            =======


    WRONG NUMBER                       -


    COMP/FAX                          183


    PRIV. MGR                           2


    NON-BUS                            97


    OTHER PHONE PROB.                  49


    DUPLICATE NUMB/NOT CALLED        1619


BURNED NUMBERS (BN)                  3207


    REFUSED                          2819


    NSP                               219


    LANGUAGE                           99
```

24

PARTIAL SCREENER REFUSAL                70

QUAL. REFUSAL                           –

NOT QUALIFIED (NQ)                    1951

TERM S1B                              1434

TERM S4                                303

TERM S11                                –

TERM S12                               194

TERM S14                                 7

TERM Q230                               10

TERM Q240                                2

TERM Q241                               –

TERM Q242                                1

TERM Q243                               –

TERM Q244_1                             –

PAGE 2

25

```
              SAMPLE DISPOSITION REPORT 05 Apr 2012  9:16 AM

        For Study: G50-0112 Promotional Items Study - OAG o12010

                          TABLE 001 (continued)

                      TOTAL SAMPLE DISPOSITION REPORT

                             BASE: TOTAL


                                  TOTAL

                                 =======

    TERM Q244_2                     -


    TERM Q244_3                     -


    TERM Q244_4                     -


OVER QUOTAS (OQ)                    1


MAX ATTEMPTS REACHED (MA)         4898


COMPLETES (CP)                     172


HIDDEN NUMBERS (HD)

-------------------                820


INCIDENCE                         8.8%


AVERAGE LENGTH OF INTERVIEW (TOTAL)   14.07




                                                    PAGE 3
```

26

**APPENDIX C**

**MATERIALS REVIEWED/FEES CHARGED**

In the course of designing the survey and preparing this report, I reviewed the following materials:  (1) ALL-IN-ONE website; (2) Norwood, Jetline, Bullet, Quickpoint, Webb, Numo, Magnet America, Sweda, Hit, Leeds, World Wide, Hub Pen, Snugz, Vitronic, Logomark, and Lanco catalogs; (3) Court order denying motion for preliminary injunction; (4) Memorandum in support of preliminary injunction motion; (5) First Amended Complaint; (6) Cohen Declaration and Exhibits; (7) All-IN-ONE 2009 and 2011 catalogs.

The fee charged for the survey and report is $85,000.  Any additional time in connection with this matter will be billed at my ordinary hourly rate of $500.

**APPENDICES D - H**

**Provided in Electronic Form**

**EXHIBIT 2**

| | |
|---|---|
| **From:** | Benni Amato |
| **Sent:** | Wednesday, October 29, 2014 1:55 PM |
| **To:** | 'Mike Lane' |
| **Cc:** | Richard Sybert; Joni Borzcik; Guillermo Marrero |
| **Subject:** | MQ v. BIC: Outstanding Issues |
| **Attachments:** | BIC Corp MSJ Final (REDACTED).pdf; BIC USA MSJ Final (REDACTED).pdf; 2014-10-27 MARKETQUEST BIC DAUBERT MOTION RE BURNETT - P&AS (2) (REDACTED).pdf; 2014-10-27 MARKETQUEST BIC DAUBERT MOTION RE DREWS - P&AS (2) (REDACTED).pdf; Norwood MSJ Final (REDACTED).pdf; 2014-10-27 MARKETQUEST BIC DAUBERT MOTION RE NON-RETAINED EXPERTS - P&AS (2).PDF |

Mike,

Thank you for speaking with me just now. Attached are just the redacted P&A's that you'd like to forward to your client for review. Note that the non-retained expert motion has no redactions.

As to extensions or resetting the motion hearing dates, you indicated that you would get back to me by this Friday with how you'd like to proceed. We will, of course, consider any proposals you may have as to the current briefing schedules.

In addition, after reviewing Plaintiff's Daubert motion, it seems that Plaintiff is conceding that there is no likelihood of confusion among end users. Although the First Amended Complaint states "consumers" throughout, it appears that the issue at trial is only whether distributors are likely to be confused. We assume that is also the case with the alleged "THE WRITE CHOICE" mark. We therefore ask that you consider entering into the following stipulation with us:

1.      There is no likelihood of confusion among end consumers with Norwood's use of the "All in ONE" phrase in 2011 on its catalogue cover and in related advertisements.

2.      There is no likelihood of confusion among end consumers with BIC USA's use of the "The Write PEN Choice" phrase (and the occasional use of "The Write Choice" phrase) for its 2011 first quarter BIC ROUND STIC 30th anniversary promotion.


Please let us know.


Thank you,

Benni Amato

_____
Yuo-Fong C. Amato   | Partner
GORDON & REES LLP<http://www.gordonrees.com/>

101 W. Broadway, Suite 2000
San Diego, CA 92101

One Commerce Square
2005 Market Street, Suite 2900
Philadelphia, PA 19103

D: 619-230-7714  |  P: 619-696-6700  |  C: 619-204-3746  |  F: 619-696-7124

bamato@gordonrees.com<mailto:bamato@gordonrees.com>

vCard<http://www.gordonrees.com/vcards/bamato.vcf>  |
Bio<http://www.gordonrees.com/atty/atty_bio_template.cfm?attyid=bamato>

Arizona * California  * Colorado * Connecticut  *  Florida * Georgia * Illinois * Maryland

Missouri * Nevada * New Jersey * New York * North Carolina  * Oregon * Pennsylvania

South Dakota * Texas * Virginia * Washington * Washington, D.C.

| | |
|---|---|
| **From:** | Mike Lane <mlane@lewiskohn.com> |
| **Sent:** | Thursday, November 13, 2014 12:07 PM |
| **To:** | Benni Amato |
| **Cc:** | Guillermo Marrero; Richard Sybert |
| **Subject:** | AIO/BIC - Email As Follow Up To Voicemail |

Benni-

Please allow this e-mail to serve as a follow up to the voicemail that I left on your direct line on Tuesday. Guillermo is now back, and we discussed several things upon his return.

First, we discussed your stipulation request. We are not willing to stipulate that "there is no likelihood of confusion amongst end consumers " concerning our Marks and we further disagree that this issue was raised or implied by our motion. By way of clarification, we contend, and our motion expressly states, that the target universe of Mr. Poret's survey should have been Distributors [i.e., the actual clients of our respective clients and the relevant universe]. If you would like to discuss a stipulation more in line with the foregoing, we are willing to consider the same as part of the L.R. 16.1.f.4 Meeting of Counsel which is supposed to be devoted, in part, to stipulations, simplifying issues for trial, etc.

On that note, second, we discussed timing of the Meeting of Counsel which must occur by or before December 1. I believe Rich is out in early December so we were thinking that maybe the week before (either the afternoon of 11/25 or anytime on 11/26) might work but I remember that Rich had lots of depositions this month. Irrespective of the date of the Meeting of Counsel, we propose that we trade exhibits as required by L.R. 16.1.f.4.b. at the earliest on December 1 – so that we have a few extra days after the November 24 deadlines to compile/finalize same. We plan on providing ours to you electronically. Please let us know if you are agreeable to these dates and whether you will be providing exhibits to us electronically or in hard copy form.

Third, after reviewing your motions from Norwood and BIC USA, we note that there is significant overlap and duplication in the law/rationale in both. As such, we'd like your agreement to a stipulation that would permit us to file a consolidated opposition to both motions in 35 pages (as opposed to two oppositions of 25 pages each). We plan on responding to BIC Corp.'s motion separately as those issues are entirely different. We believe that filing a consolidated opposition will save both the Court and your office time and expense.

Fourth, regarding the November 24 deadlines, FRCP 26a3 requires us to trade and file witness, exhibit, and deposition lists. Regarding deposition lists specifically, the Rule states in relevant part:

> (3) *Pretrial Disclosures.*
>
> (A) *In General.* In addition to the disclosures required by Rule 26(a)(1) and (2), a party must provide to the other parties and promptly file the following information about the evidence that it may present at trial other than solely for impeachment:
>
> [...]
>
> **(ii) the designation of those witnesses whose testimony the party expects to present by deposition and, <u>if not taken stenographically</u>, a transcript of the pertinent parts of the deposition... (emphasis added)**

The Advisory Comments for Rule 26a3 state in relevant part:

A party expecting to use at trial a deposition not recorded by stenographic means is required by revised Rule 32 to provide the court with a transcript of the pertinent portions of such depositions. This rule requires that copies of the transcript of a nonstenographic deposition be provided to other parties in advance of trial for verification, an obvious concern since counsel often utilize their own personnel to prepare transcripts from audio or video tapes. By order or local rule, the court may require that parties designate the particular portions of stenographic depositions to be used at trial.

Since all the depositions in our case were taken stenographically (and nearly all by video as well), and there is no Local Rule 32 in the Southern District, we propose to follow guidelines established in the Central District of California regarding video depo designations. Specifically, C.D.L.R. 32.-1, which reads:

L.R. 32-1 Use at Trial or an Evidentiary Hearing.

Deposition transcripts to be used at trial or an evidentiary hearing shall be marked as provided in L.R. 16-2.7. The original deposition shall be lodged with the Clerk on or before the first day of a trial or at least ten (10) days before an evidentiary hearing unless required to be filed earlier under L.R. 16-11.2. In addition, all original depositions not so lodged shall be brought to court by the attorney in custody of the same for any trial. Any party may by notice require an original deposition to be lodged for a trial or an evidentiary hearing. At a trial or an evidentiary hearing, the Court may order a lodged deposition to be filed or received in evidence, or may direct a party to prepare extracts from a deposition to be filed or received in evidence. The requirement for marking depositions shall not apply to depositions intended to be used at trial solely for impeachment.

L.R. 16-2.7 in the Central District reads:

L.R. 16-2.7 Depositions. Each party intending to present any evidence by way of deposition testimony shall:

(a)  Identify on the original transcript the testimony the party intends to offer by bracketing the questions and answers in the margins. The opposing party shall likewise countermark any testimony that it plans to offer. The parties shall agree between themselves on a separate color to be used by each party which shall be consistently used by that party for all depositions offered in the case.
(b)  Identify any objections to the proffered evidence in the margins of the deposition by briefly stating the ground for the objection.
(c) At the time of lodging under L. R. 32-1, also serve and file an index of the portions of the deposition offered, stating the pages and lines offered, objections, and the grounds for the objections.

Given the number of months that we still have before trial and the number of videotaped depositions in this case, we suggest that we agree to adopt by stipulation a procedure and deadlines for designating (maybe 30 days before trial), then counter-designating and objecting (maybe 15 days before trial), and lodging (maybe 3 days before trial) deposition transcripts that will be read into the record or played back on videotape.  By way of further explanation, I placed a call with the Court clerk to see if this would even be possible before I brought this up with you. He noted that since they were a new chambers, they had not encountered this issue previously and that a stipulation between counsel would prove helpful to the Court.

Accordingly, if you are agreeable to points three and four above, namely entering into a stipulation regarding our consolidated opposition and videotaped designation/objection/lodging procedure, I will take the laboring oar in preparing same for your review. If not, please be advised that we plan on moving *ex parte* for that relief on Monday, 11/17.

Also, please let me know which dates/times work for our Meeting of Counsel and whether trading exhibits on December 1 makes sense to you or whether you'd prefer more time for both of us.

Thank you for your consideration.

Best regards,

Michael Lane, Partner
LEWIS | KOHN

Lewis Kohn & Fitzwilliam LLP
10935 Vista Sorrento Parkway, Suite 370
San Diego, CA  92130
Direct 858.436.1335 | Fax 858.436.1349 | Cell 619.952.1245
mlane@lewiskohn.com | www.lewiskohn.com

NOTICE:  This electronic message is from a law firm and may contain confidential or privileged information. If you received this transmission in error, please inform the sender of such error and delete this transmission and any attachments.

IRS Circular 230 Disclosure: To ensure compliance with requirements imposed by the IRS, we inform you that any U.S. federal tax advice contained in this communication (including any attachments) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting, marketing, or recommending to another party any transaction or matter addressed herein.

**EXHIBIT 3**

GUILLERMO MARRERO (Bar No. 099056)
gmarrero@ipglaw.com
INTERNATIONAL PRACTICE GROUP, P.C.
A Professional Corporation
1350 Columbia Street, Suite 500
San Diego, California 92101
Tel (619) 515-1480
Fax (619) 515-1481

DAVID M. KOHN (SBN 246756)
MICHAEL T. LANE (SBN 248624)
mlane@lewiskohn.com
KENT M. WALKER (SBN 173700)
kent@kentmwalker.com (of counsel)
LEWIS KOHN & FITZWILLIAM, L.L.P.
10935 Vista Sorrento Parkway, Suite 370
San Diego, California 92130
Tel (858) 436-1330
Fax (858) 436-1349

Attorneys for Plaintiff
MARKETQUEST GROUP, INC. d/b/a ALL-IN-ONE

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARKETQUEST GROUP, INC., a California corporation d/b/a All-In-One,<br><br>                              Plaintiff,<br><br>vs.<br><br>BIC CORPORATION, a Connecticut corporation; BIC USA INC., a Delaware corporation; NORWOOD PROMOTIONAL PRODUCTS, LLC, a Delaware limited liability company d/b/a Norwood Promotional Products; and DOES 1 through 50, inclusive,<br><br>                              Defendants.<br><br>AND RELATED COUNTERCLAIMS. | Case No. 11-cv-0618 JLS WMc<br><br>**PLAINTIFF'S SECOND AMENDED RESPONSES TO DEFENDANT BIC CORPORATION'S INTERROGATORIES (SET ONE)** |

PROPOUNDING PARTY: BIC Corporation

RESPONDING PARTY: MarketQuest Group, Inc. d/b/a All-In-One

SET NO.: One (1)

TO:  Defendant, BIC Corporation, and its attorneys of record:

-1-

**[REMAINDER OF DOCUMENT REDACTED]**

**EXHIBIT 4**

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

MARKETQUEST GROUP, INC., d/b/a
All-In-One,

      Plaintiff,

   vs.

Case No. 11-CV-0618 JLS WMC

BIC CORPORATION, BIC USA, INC., and
NORWOOD PROMOTIONAL PRODUCTS LLC,

    Defendants.
_____

* * * CONFIDENTIAL - ATTORNEYS' EYES ONLY * * *

VIDEOTAPED DEPOSITION OF HARRIS COHEN

VOLUME I

San Diego, California

February 9, 2012

Reported by:
Debby M. Gladish
RPR, CLR, CCRR, CSR No. 9803
NCRA Realtime Systems Administrator

Job No. 10001802

*@ptus*
619.546.9151
619.546.9152
aptusCR.com

**[REMAINDER OF DOCUMENT REDACTED]**