# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARKETQUEST GROUP, INC., <br><br> Plaintiff, <br><br> v. <br><br> BIC CORPORATION, *et al.*, <br><br> Defendants. <br><br> AND RELATED COUNTERCLAIMS. | Case No. 11-cv-618-BAS (JLB) <br><br> **ORDER DENYING DEFENDANTS'*DAUBERT* MOTION TO EXCLUDE OPINIONS OF DAVID DREWS** <br><br> **[ECF No. 218]** |

On March 28, 2001, Plaintiff Marketquest Group, Inc. ("Marketquest") filed this action for trademark infringement and unfair competition against Defendants BIC Corp., BIC USA, and Norwood Promotional Products ("BIC"). (ECF No. 1.) On May 5, 2011, Marketquest filed the operative First Amended Complaint ("FAC"). (FAC, ECF No. 14.) On May 13, 2011, BIC filed its Answer and Counterclaims. (ECF No. 17.)

Presently before the Court is BIC's Motion to Exclude the Opinions of David

Drews, an expert witness for Marketquest, arguing that Mr. Drews' testimony is based upon insufficient data and faulty methods that have not been reliably applied to the facts of this case. (BIC's Mot., ECF No. 218.) Marketquest opposes. (Opp'n, ECF No. 261.)

The Court finds this motion suitable for determination on the papers submitted and without oral argument. *See* Fed. R. Civ. P. 78(b); Civ. L.R. 7.1(d)(1). For the following reasons, the Court **DENIES** BIC's motion.

I.  BACKGROUND

Plaintiff Marketquest is a California corporation that produces, advertises, and sells customizable promotional products using the registered trademarks "ALL-IN-ONE" and "The Write Choice." (FAC ¶¶ 10-12.) Marketquest alleges Defendant BIC began advertising and selling products using marks similar to Marketquest's. (*Id.* ¶¶ 21-25.) Specifically, Marketquest claims BIC used the phrase "The Write Pen Choice" in an online advertising campaign for writing instruments beginning in October, 2010. (*Id.* ¶ 23.) Around the same time, Norwood Promotional Products, LLC, a subsidiary of BIC USA, printed a 2011 catalogue entitled the "NORWOOD All in ONE" catalogue. (*Id.* ¶ 24.)

Marketquest retained Mr. Drews as an expert witness to testify on the appropriate level of damages to be awarded for the unauthorized use of Marketquest's registered trademarks. (Drews Report, ECF No. 232-1, Ex. A.) The analysis and damages detailed in the report cover the "period of infringement" from January 1, 2011, through December 31, 2011, as well as the period of ongoing negative impact to Marketquest's business through December 31, 2013. (*Id.* 2.) Mr. Drews concludes the damages suffered by the alleged infringing use are as follows: $19,882,603 when measured by the combination of BIC's profits and corrective advertising; $8,179,004 when measured by the combination of a reasonable royalty and corrective advertising; and $1,852,007 when measured by the combination of lost profits and corrective advertising. (*Id.* 5.)

To rebut Mr. Drews' testimony, BIC retained Neal J. Beaton as an expert witness. (Beaton Report, ECF No. 232-1, Ex. B.) Mr. Beaton's report argues Drews' calculations are overstated, faulty, and based on unreliable data. (*Id.* 5.) Further, he contends that Drews misapplied the facts of the case, inappropriately analyzed company and industry data, and relied on unsupportable assumptions. (*Id.*) Mr. Beaton concludes that corrective advertising damages are not applicable and opines damages as follows: $10,925 when measured by BIC's unjust enrichment; $10,000 when measured by reasonable royalties; and $0 when measured by Marketquest's lost profits. (*Id.* 5-6.)

## II. LEGAL STANDARD

Federal Rule of Evidence 702 establishes several requirements for admissibility of expert opinion evidence: (1) the witness must be sufficiently qualified as an expert by knowledge, skill, experience, training, or education; (2) the scientific, technical, or other specialized knowledge must "assist the trier of fact" either "to understand the evidence" or "to determine a fact in issue"; (3) the testimony must be "based on sufficient facts and data"; (4) the testimony must be "the product of reliable principles and methods"; and (5) the expert must reliably apply the principles and methods to the facts of the case. Fed. R. Evid. 702.

Under *Daubert* and its progeny, the trial court is tasked with assuring that expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (citation and quotation marks omitted). Shaky but admissible evidence is to be attacked by cross-examination, contrary evidence, and careful instruction on the burden of proof, not exclusion. *Daubert*, 509 U.S. at 596. The judge is "to screen the jury from unreliable nonsense opinions, but not exclude

opinions merely because they are impeachable." *Alaska Rent–A–Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). In its role as gatekeeper, the trial court "is not tasked with deciding whether the expert is right or wrong, just whether his [or her] testimony has substance such that it would be helpful to a jury." *Id.* at 969-70.

The tests for admissibility in general, and reliability in particular, are flexible. *Primiano*, 598 F.3d at 564. The Supreme Court has provided several factors to determine reliability: (1) whether a theory or technique is testable; (2) whether it has been published in peer reviewed literature; (3) the error rate of the theory or technique; and (4) whether it has been generally accepted in the relevant scientific community. *Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1064 (9th Cir. 2002) (summarizing *Daubert*, 509 U.S. at 592-94), *overruled on other grounds by Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 460 (9th Cir. 2014). These factors are meant to be "helpful, not definitive." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151 (1999). The court "has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on the particular circumstances of the particular case." *Primiano*, 598 F.3d at 564 (citations and quotation marks omitted). "[T]he test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995). Once the threshold established by Rule 702 is met, the expert may testify and the fact finder decides how much weight to give that testimony. *Primiano*, 598 F.3d at 565.

After admissibility is established to the court's satisfaction, attacks aimed at the weight of the evidence are the province of the fact finder, not the judge. *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 814 (9th Cir. 2014). The court should not make credibility determinations that are reserved for the jury. *Id.*

## III. DISCUSSION

### A. Mr. Drews is Qualified and His Testimony is Relevant

As a preliminary matter, the Court recognizes that BIC does not challenge either Mr. Drews' qualifications to testify as an expert or that his testimony will assist the trier of fact. The Court agrees.

Mr. Drews is an intellectual property consultant with over twenty-five years of experience in valuing intellectual property of all types, including trademarks. (Drews Report 3.) He regularly publishes articles in industry publications, frequently lectures on intellectual property valuation issues, and is called upon to calculate and testify on damages related to infringement of intellectual property in numerous litigation and arbitration proceedings. (*Id.* 3.) A court would have to find that Mr. Drews is "qualified as an expert by knowledge, skill, experience, training, or education" to render an opinion on the appropriate level of damages to be awarded for the unauthorized use of intellectual property.

The requirement that expert testimony "assist the trier of fact" either "to understand the evidence" or "to determine a fact in issue" goes primarily to relevance. *Daubert*, 509 U.S. at 591. "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry." *Primiano*, 598 F.3d at 565. The pertinent inquiry here is the appropriate level of damages for trademark infringement. Mr. Drews' testimony, with a sufficient basis in experience and education, speaks directly to this point. That is enough to assist the trier of fact.

### B. Mr. Drews' Testimony is Reliable

BIC moves to exclude Mr. Drews' testimony and report based on reliability grounds. (BIC's Mot. 1:2-3.) The attacks fit into the remaining three categories listed by Rule 702 as necessary for admissibility: "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed. R. Evid. 702. Based on the following, the Court finds that the knowledge

underlying Drews' report "has a reliable basis in the knowledge and experience of the relevant discipline," rendering his report reliable. *See Primiano*, 598 F.3d at 565.

### 1. Mr. Drews' Testimony is Based Upon Sufficient Facts and Data

BIC argues Mr. Drews' testimony should be excluded because it is based on insufficient facts and data. (BIC's Mot. 4:3-20.) The Court finds the facts and data underpinning Mr. Drews' opinions are of sufficient substance to be helpful to a jury. BIC's disagreements over the factual basis of Mr. Drews' opinions bear on the weight of the opinions rather than on their admissibility. *See Primiano*, 698 F.3d at 565.

First, BIC argues Mr. Drews' testimony should be excluded because it ignores relevant factors influencing Marketquest's financial situation in 2011. (BIC's Mot. 12:8-11.) Specifically, BIC contends that Drews' report does not consider the effect of the falling price of USB drives in 2011; incorrectly assumes that Marketquest experienced growth commensurate with industry growth; and does not account for the negative effect of Marketquest's poor 2011 business decisions. (*Id.* 11:5-21.) These asserted defects, however, go to the weight, and not the admissibility, of Mr. Drews' testimony. *See Southland Sod Farms v. Stover Seed Co.*, 108 F.3d 1134, 1143 (9th Cir. 1997) (holding asserted defects of model went to weight where it "did not consider what Bonsai sales would have been as a result of lawful competitive efforts; . . . it assumed that the market for non-dwarf tall fescues would hold for dwarf tall fescues; and it did not account for the fact that the drought and recession in Southern California may have affected different producers differently").

Next, BIC makes two arguments that Mr. Drews' testimony relies on insufficient data. First, BIC contends that Mr. Drews' report inappropriately rests its opinions of future damages on "industry growth rates" data that is "self-reported" to the "leading trade organizations by industry distributors." (BIC's Mot. 13:15-17.) Such data, BIC reasons, is unverified and undermined by the fact that Marketquest's sales increased in 2012 and 2013 and that it has never mirrored industry growth as

Mr. Drews assumes. (*Id.* 13:15-14:2.) It appears that Mr. Drews' reliance on this data is acceptable in the industry, though, given that BIC's expert uses the very same data. (Lane Suppl. Decl. ¶ 90, ECF No. 258-42, Ex. S.2.) Again, BIC's disagreements over the factual basis of Mr. Drews' opinions do not make his testimony so fundamentally flawed that it would be of no assistance to the jury on the issue of future damages; they bear on the weight of the opinions, not their admissibility, and would be appropriately utilized via cross-examination and presentation of contrary evidence.

Second, BIC argues that Mr. Drews' royalty rate analysis is not based on reasonable hypothetical conditions and its ultimate valuations are overstated. (BIC's Mot. 14:6-7.) The Court is not concerned with whether or not Mr. Drews' ultimate valuation appears overblown to BIC, indeed that is to be expected. Instead, what matters is whether Mr. Drews used reliable methods based on sufficient facts and data. *See Daubert*, 509 U.S. at 594-95. BIC does not disagree that application of the *Georgia-Pacific* factors is an accepted approach to determine reasonable royalty rates in intellectual property matters. (*See* Beaton Report ¶ 61.) What BIC does disagree with is that any conclusions can be drawn from the fact that BIC has engaged in inter-company licensing agreements in the past, that a two-year hypothetical license is an appropriate length of time, or that *Grimes & Battersby* data is a suitable substitute for more specific licensing data. (BIC's Mot. 14:20-15:10.) The Court finds that each of these data points attacked by BIC have "a reliable basis in the knowledge and experience of the relevant discipline." *See Primiano*, 598 F.3d at 565. BIC's engagement in inter-company licensing agreements demonstrates an appreciation of the benefits to be gained from using another party's intellectual property. A two-year licensing agreement is foreseeable given the alleged infringement lasted for one year and confusion is alleged to have continued for two. *Grimes & Battersby* is a respected industry publication and its use is understandable given the lack of any actual agreements for comparison. That an expert's testimony may be tentative or based on hypotheticals does not mean it must be excluded.

In sum, BIC disagrees with many of Mr. Drews' findings, but this does not affect the reliability of his testimony. The evidentiary requirement of reliability is less than the standard of correctness, and an expert's methodology may be helpful even when the judge thinks the technique has flaws sufficient to render an expert's conclusions inaccurate. Often hearing the expert's testimony and considering its flaws is an important part of assessing what conclusion is correct and a jury attempting to reach an accurate outcome ought to consider the evidence. Mr. Drews' testimony is not so factually flawed that it would be of no assistance to the jury.

### 2. Mr. Drews' Testimony is the Product of Reliable Principles and Methods

BIC moves to exclude Mr. Drews' testimony and report on the grounds that his damages analysis fails to apportion profits to the alleged infringing use, employs corrective advertising as a measure of damages, and applies a 25% prospective corrective advertising budget. (BIC's Mot. 3:19-4:2.)

First, BIC argues that Mr. Drews' failure to (i) apportion profit to the alleged infringement, or (ii) consider the approaches used by its own expert, renders his method unreliable because it does not meet the same level of care as would be expected in regular professional work from a seasoned economist. That Mr. Drews and Mr. Beaton used different methodologies for their respective analyses, on its own, does not require the Court to conclude that Mr. Drews' methods are unreliable. *See* Fed. R. Evid. 702 advisory committee's note; *see also Ruiz-Troche v. Pepsi Cola*, 161 F.3d 77, 85 (1st Cir. 1998) ("*Daubert* neither requires nor empowers trial courts to determine which of several competing scientific theories has the best provenance.") As Marketquest correctly notes, the burden of proving the portion of the profit attributable to factors other than use of the infringing mark is on the defendant. *See Mishawaka Rubber & Woolen Mfg. Co. v. S. S. Kresge Co.*, 316 U.S. 203, 206 (1942) ("If it can be shown that the infringement had no relation to profits made by the defendant, that some purchasers bought goods bearing the infringing

mark because of the defendant's recommendation or his reputation or for any reason other than a response to the diffused appeal of the plaintiff's symbol, the burden of showing this is upon the poacher."); *Maier Brewing Co. v. Fleischmann Distilling Corp.*, 390 F.2d 117, 124 (9th Cir. 1968) (quoting *Mishawaka, supra*). Mr. Drews established all sales attributable to the alleged trademark uses based on financial statements produced by BIC to reflect such data and then subtracted the costs of goods sold from their infringing use. (Drews Report 13-14.) The burden then moves to BIC to prove the appropriate expense deductions that will bring gross profits to the actual damages level of incremental operating profits. Such a method does not appear to be one of the "unreliable nonsense opinions" this Court is tasked with screening. *See Alaska Rent–A–Car*, 738 F.3d at 969.

Second, BIC contends that corrective advertising is an improper measure of damages because there is no foundation for why customers remain confused or how corrective advertising would have any effect on customer confusion so many years after BIC's activities in 2011. (BIC's Mot. 7:18-20.) The Ninth Circuit, however, does not follow the requirement that a plaintiff must engage in corrective advertising at around the time of the infringement in order to recover corrective advertising. *See Adray v. Adry-Mart, Inc.*, 76 F.3d 984, 988-89 (9th Cir. 1996). An award of the cost of corrective advertising is intended to make the plaintiff whole by allowing recovery of the cost of advertising undertaken to restore the value the trademark has lost due to infringement. *Id.* at 988. Recovery of both past and future corrective advertising costs is permitted. *Id.* at 988-89 (citing *Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1374-76 (10th Cir. 1977)) (acknowledging "reverse confusion" and approving a corrective advertising campaign reasonably equivalent to the infringing advertising campaign). Marketquest is alleging a case of reverse confusion in which BIC knowingly used Marketquest's marks in a manner that saturated the market with a false impression of association, dragging Marketquest's sales down alongside BIC's "unprecedented" low numbers. (Marketquest's Mot.

Summ. J. 10:9-11:25, ECF 205-1.) Under such circumstances, compensatory corrective advertising damages would be conceivably appropriate to counteract BIC's infringing advertising campaigns so long as Mr. Drews' analysis has the "soundness of methodology" required by *Daubert*. The Court is satisfied that Mr. Drews' calculation, based on BIC's advertising expenses devoted to infringing Marketquest's marks, meets that requirement.

Third, BIC argues that Marketquest should not be entitled to a corrective advertising award in the amount of 25% of Defendant's advertising budget. (BIC's Mot. 8:22.) The 25% limitation was derived from the Federal Trade Commission's rule requiring businesses engaged in misleading advertising to spend 25% of their budget on corrective advertising and applied in the first case to recognize reverse confusion. *Big O Tire*, 561 F.2d at 1375-76. The Ninth Circuit has acknowledged and implicitly approved this approach:

> We need not determine how the costs are to be calculated because the court below did not reach the issue. We note that courts have awarded a percentage of the advertising amount spent infringing on the plaintiff's mark, *Big O Tires*, 561 F.2d at 1375-76, and have acknowledged the Federal Trade Commission's rule requiring businesses who engage in misleading advertising to spend 25% of their advertising budget on corrective advertising.

*Adray*, 76 F.3d at 989. While the Court acknowledges that prospective costs present a danger of overcompensation, the burden of any uncertainty in the amount of damages should be borne by the wrongdoer and can be avoided by appropriate limitation in the jury instructions. *Id.*

Based on the foregoing, the Court finds Mr. Drews' testimony is the product of sufficiently reliable principles and methods for the purposes of Rule 702.

### 3. Mr. Drews Has Applied the Principles and Methods Reliably to the Facts

BIC contends that Mr. Drews' report is unreliable because he does not

adequately cite to the documents relied upon and BIC's rebuttal expert is unable to replicate the results. (BIC's Mot. 17:15-17.) The Court disagrees. Mr. Drews' source data is clearly cited throughout his report as well as in its appendix. (Drews Report 60-62.) In fact, Mr. Beaton used the very same source data to rebut Mr. Drews. (Beaton report ¶¶ 52-56.)

That BIC's expert reached different conclusions than Marketquest's provides no basis for excluding expert opinion testimony. "[T]he test . . . is not the correctness of the expert's conclusions but the soundness of his methodology." *Daubert*, 43 F.3d at 1318. Indeed, *Daubert* expects expert testimony of sufficient relevance and reliability to be tested by the adversary process—competing expert testimony and active cross-examination—not excluded from factfinders' inspection for fear they will not understand its complexities or satisfactorily balance its inadequacies. Mr. Drews set forth the methodology used, described the various measurements relevant to his calculations, and applied the principles and methods reliably to the facts of the case. Thus, the Court finds Mr. Drews' report and testimony are reliable and admissible.

## IV. CONCLUSION

The Court **DENIES** Defendants' *Daubert* Motion to Exclude Opinions of David Drews. (ECF No. 218.) The report and testimony are relevant and offered with sufficient foundation by one qualified to give it.

**IT IS SO ORDERED.**

DATED: April 12, 2018

Hon. Cynthia Bashant
United States District Judge