# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARKETQUEST GROUP, INC., <br><br> Plaintiff, <br><br> v. <br><br> BIC CORPORATION, *et al.*, <br><br> Defendants. <br><br> AND RELATED COUNTERCLAIMS. | Case No. 11-cv-618-BAS (JLB) <br><br> **ORDER DENYING PLAINTIFF'S MOTION TO EXCLUDE SURVEY AND TESTIMONY OF HAL PORET** <br><br> **[ECF No. 199]** |

On March 28, 2001, Plaintiff Marketquest Group, Inc. ("Marketquest") filed this action for trademark infringement and unfair competition against Defendants BIC Corp., BIC USA, and Norwood Promotional Products ("BIC"). (ECF No. 1.) On May 5, 2011, Marketquest filed the operative First Amended Complaint ("FAC"). (FAC, ECF No. 14.) On May 13, 2011, BIC filed its Answer and Counterclaims. (ECF No. 17.)

Presently before the Court is Marketquest's Motion to Exclude the Survey and

Testimony of Hal Poret. (Marketquest's Mot., ECF No. 199.) Marketquest argues that Mr. Poret's survey is irrelevant and unreliable because it surveyed the wrong universe and failed to adequately replicate market conditions. BIC opposes. (Opp'n, ECF No. 257.)

The Court finds this motion suitable for determination on the papers submitted and without oral argument. *See* Fed. R. Civ. P. 78(b); Civ. L.R. 7.1(d)(1). For the following reasons, the Court **DENIES** Marketquest's motion.

I. BACKGROUND

Plaintiff Marketquest is a California "supplier" that produces, advertises, and sells customizable promotional products using the registered trademarks "ALL-IN-ONE" and "The Write Choice." (FAC ¶¶ 10-12.) Defendant BIC represents one of the largest suppliers in the promotional products industry. (Marketquest's Mot. Partial Summ. J. 1:12-2:7, ECF No. 205.) The promotional products industry supports the manufacture and distribution of promotional products to companies ("end consumers") who want to brand themselves with customers. (Marketquest's Mot. 1:16-18.) When a company wants to brand itself with its customers it approaches a promotional products "distributor." (*Id.* 1:19-21.) The distributor then approaches a supplier (such as Marketquest or BIC) who either manufactures or imports a promotional product on which the end consumer's brand is imprinted. (*Id.* 1:21-23.) According to Marketquest, such segregation of suppliers, distributors, and end consumers is an integral part of the industry and never bypassed. (*Id.* 2:1-3.)

Marketquest alleges BIC began advertising and selling products using marks similar to Marketquest's. (FAC ¶¶ 21-25.) Specifically, Marketquest claims BIC used the phrase "The Write Pen Choice" in an online advertising campaign for writing instruments beginning in October, 2010. (*Id.* ¶ 23.) Around the same time, Norwood Promotional Products, LLC, a subsidiary of BIC USA, printed a 2011 catalog entitled the "NORWOOD All in ONE" catalog. (*Id.* ¶ 24.) Alleging a form of reverse confusion, Marketquest argues that BIC's use of its marks to compete with it in

selling the same products—to the same customers in the same advertising channels—in combination with BIC's reputation as a brand aggregator, caused confusion amongst customers. (Marketquest's Mot. Partial Summ. J. 4:14-18.)

BIC retained Mr. Poret as an expert witness to conduct a survey to determine the extent to which use of the phrase "All in ONE" on the cover of the 2011 Norwood Catalog is likely to have caused confusion with respect to Marketquest's ALL-IN-ONE mark. (Poret Report 1, ECF No. 256-3, Ex. 1.) Mr. Poret conducted a Sequential Lineup Survey wherein end consumers were called on the phone and asked to look at materials on their computer screen while they were being interviewed. (*Id.* 3.) Respondents were first shown the Marketquest website, then parts of four catalogs offering customizable promotional products, one of which was the 2011 Norwood Catalog. (*Id.*) They were then asked if they connected any of the catalogs to the Marketquest website and, if so, why. (*Id.* 4.) The survey was conducted under the assumption that distributors often show catalogs to potential end consumers. (*Id.* 22.) The results of the survey indicate a rate of 4.7% potential trademark confusion, a rate typically considered de minimis. (*Id.* 21.) Based on the survey results, Mr. Poret is of the opinion that there is no likelihood of confusion caused by the use of the words "All in ONE" on the 2011 Norwood Catalog. (*Id.*)

## II. LEGAL STANDARD

Federal Rule of Evidence 702 establishes several requirements for admissibility of expert opinion evidence: (1) the witness must be sufficiently qualified as an expert by knowledge, skill, experience, training, or education; (2) the scientific, technical, or other specialized knowledge must "assist the trier of fact" either "to understand the evidence" or "to determine a fact in issue"; (3) the testimony must be "based on sufficient facts and data"; (4) the testimony must be "the product of reliable principles and methods"; and (5) the expert must reliably apply the principles and methods to the facts of the case. Fed. R. Evid. 702.

Under *Daubert* and its progeny, the trial court is tasked with assuring that

expert testimony "both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993). "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." *Primiano v. Cook*, 598 F.3d 558, 565 (9th Cir. 2010) (citation and quotation marks omitted). Shaky but admissible evidence is to be attacked by cross-examination, contrary evidence, and careful instruction on the burden of proof, not exclusion. *Daubert*, 509 U.S. at 596. The judge is "to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *Alaska Rent–A–Car, Inc. v. Avis Budget Grp., Inc.*, 738 F.3d 960, 969 (9th Cir. 2013). In its role as gatekeeper, the trial court "is not tasked with deciding whether the expert is right or wrong, just whether his [or her] testimony has substance such that it would be helpful to a jury." *Id.* at 969-70.

The tests for admissibility in general, and reliability in particular, are flexible. *Primiano*, 598 F.3d at 564. The Supreme Court has provided several factors to determine reliability: (1) whether a theory or technique is testable; (2) whether it has been published in peer reviewed literature; (3) the error rate of the theory or technique; and (4) whether it has been generally accepted in the relevant scientific community. *Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1064 (9th Cir. 2002) (summarizing *Daubert*, 509 U.S. at 592-94), *overruled on other grounds by Estate of Barabin v. AstenJohnson, Inc.*, 740 F.3d 457, 460 (9th Cir. 2014). These factors are meant to be "helpful, not definitive." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 151 (1999). The court "has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, based on the particular circumstances of the particular case." *Primiano*, 598 F.3d at 564 (citations and quotation marks omitted). "[T]he test under *Daubert* is not the correctness of [experts'] conclusions but the soundness of [their] methodology." *Daubert v. Merrell Dow*

*Pharmaceuticals, Inc.*, 43 F.3d 1311, 1318 (9th Cir. 1995). Once the threshold established by Rule 702 is met, the expert may testify and the fact finder decides how much weight to give that testimony. *Primiano*, 598 F.3d at 565.

After admissibility is established to the court's satisfaction, attacks aimed at the weight of the evidence are the province of the fact finder, not the judge. *Pyramid Techs., Inc. v. Hartford Cas. Ins. Co.*, 752 F.3d 807, 814 (9th Cir. 2014). The court should not make credibility determinations that are reserved for the jury. *Id.*

## III.  DISCUSSION

Marketquest argues Mr. Poret's survey is inadmissible because (i) it surveyed the wrong universe of respondents and (ii) does not adequately replicate market conditions. (Marketquest's Mot. 3:7-14.)

The Ninth Circuit has held that evidence from a professionally conducted survey should generally be found sufficiently reliable and admissible under the gatekeeping test of *Daubert*. *Southland Farms v. Stover Seed Co.*, 108 F.3d 1134, 1143 n.8 (9th Cir. 1997) (explaining that survey evidence is ordinarily admissible because "[u]nlike novel scientific theories, a jury should be able to determine whether asserted technical deficiencies undermine a survey's probative value"); *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1292 (9th Cir. 1992) ("[I]t is routine to admit a relevant survey; any technical unreliability goes to weight, not admissibility."). A survey can be admitted into evidence once it has passed the threshold conditions of having a proper foundation, being relevant and having been conducted according to accepted principles. *Clicks Billiards, Inc v. Sixshooters Inc.*, 251 F.3d 1252, 1263 (9th Cir. 2001). "Once the survey is admitted . . . follow-on issues of methodology, survey design, reliability, the experience and reputation of the expert, critique of conclusions, and the like go to the weight of the survey rather than its admissibility." *Id.* However, serious flaws may make reliance on a survey unreasonable such that a court ought to exercise its gatekeeping role and exclude the survey. *See M2 Software, Inc. v. Madacy Entm't*, 421 F.3d 1073, 1087 (9th Cir. 2005)

(finding no abuse of discretion in excluding survey evidence where "it was not created or conducted in a manner that complied with appropriate standards"). Marketquest contends that is the case here.

A. **Universe of Respondents**

Marketquest argues that Mr. Poret selected the wrong universe of respondents. In particular, Marketquest claims Mr. Poret's survey cannot assess the likelihood of confusion in this case because it polled the reactions of end consumers of promotional products rather than Marketquest's actual customers, the distributors. (Marketquest's Mot. 3:7-14.) Although the decision to limit the survey's population to end consumers reduces its probative value, the Court is unwilling to exclude it on that basis alone.

"The selection of an inappropriate universe generally affects the weight of the resulting survey data, not its admissibility." 6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 32:162 (5th ed. 2018). Even if a survey does not select the optimal universe, the results are often still probative of the fact it was intended to prove. *See Vision Sports, Inc. v. Melville Corp.*, 888 F.2d 609, 615 (9th Cir. 1989) (holding that an underinclusive survey's results were so strong that it still supported a finding of secondary meaning). Indeed, courts within the Ninth Circuit are largely unwilling to exclude survey evidence on the basis of an overinclusive or underinclusive target population. *See Icon Enters. Int'l v. Am. Prods. Co.*, No. CV 04-1240, 2004 WL 5644805, at *25-26 (C.D. Cal. Oct. 7, 2004) (summarizing cases addressing improper survey universe). If the responses of the surveyed universe are irrelevant to the opinions of the universe at issue, however, the court has the authority to declare the survey inadmissible. McCarthy, *supra*, § 32:162; *see also* Shari Seidman Diamond, *Reference Guide on Survey Research, Reference Manual on Scientific Evidence* 359, 377 (Federal Judicial Center ed., 3d ed. 2011) ("A survey that provides information about a wholly irrelevant universe of respondents is itself irrelevant.").

In a reverse confusion case such as this, the proper universe to survey is the senior user's customer base. McCarthy, *supra*, § 32:159. Professor McCarthy provides a useful juxtaposition of forward and reverse confusion:

> The traditional pattern of classic "forward confusion" occurs when customers mistakenly think that the junior user's goods or services are from the same source as or are connected with the senior user's goods or services. Customers want to buy the senior user's product and because of the similarity of marks, mistakenly buy the junior user's product instead. In "reverse confusion," customers purchase the senior user's goods under the mistaken impression that they are getting the goods of the junior user. That is, reverse confusion occurs when the junior user's advertising and promotion so swamps the senior user's reputation in the market that customers are likely to be confused into thinking that the senior user's goods are those of the junior user: the reverse of traditional confusion.

*Id.* § 23:10.

The question is not whether BIC had an intent to trade on Marketquest's goodwill and reputation, but rather whether a reasonable consumer might erroneously believe that Marketquest's goods are BIC's. *See Dreamwerks Prod. Grp., Inc. v. SKG Studio*, 142 F.3d 1127, 1130 (9th Cir. 1998) (holding in a reverse confusion case that the proper question "is whether a reasonable consumer attending a Dreamwerks-sponsored convention might do so believing that it is a convention sponsored by DreamWorks"). The injury is that customers come to assume that the senior user's products are really the junior user's or that the former has somehow become connected to the latter. *See Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber Co.*, 561 F.2d 1365, 1372 (10th Cir. 1977) (finding potential likelihood of reverse confusion where "Big O presented more than a dozen witnesses who testified to actual confusion as to the source of Big O's 'Big Foot' tires after watching a Goodyear 'Bigfoot' commercial"). This results in the senior user losing the value of the trademark, i.e. control over its goodwill and reputation, its product identity, corporate identity, and ability to move into new markets. *Sands, Taylor & Wood Co.*

*v. Quaker Oats Co.*, 978 F.2d 947, 957 (7th Cir. 1992), *reversed on other grounds by Sands, Taylor & Wood v. Quaker Oats Co.*, 34 F.3d 1340 (7th Cir. 1994). Therefore, a proper survey of likelihood of confusion in this case should assess whether those familiar with BIC's stronger mark, and who encounter Marketquest's less well-known mark, affiliate it with BIC's mark. *See Dreamwerks*, 142 F.3d at 1130.

The stated purpose of Mr. Poret's survey was "to determine the likelihood . . . that prospective purchasers of customizable promotional products would be confused by the use of the words 'All in ONE' on the [2011 Norwood Catalog]." (Poret Report 1.) "[T]he survey universe consisted of prospective end purchasers of customizable promotional products – i.e., individuals who are involved in decisions about ordering customizable promotional products for their business or organization." (*Id.* 3.) Marketquest contends that because both parties are suppliers, and suppliers never bypass distributors to sell directly to end consumers, the likelihood of end consumer confusion is irrelevant in this case. (Marketquest's Mot. 7:17-9:5.) Rather, considering these supply chain distinctions, Mr. Poret's survey should have tested the likelihood of distributor confusion over BIC's use of the words "All in ONE." (*Id.* 8:13-15.)

BIC maintains that potential end consumers are relevant because they are exposed to Marketquest's mark in the context of making decisions about purchasing its products. (Opp'n 11:5-10.) Further, Mr. Poret argues, "it made more sense to survey end users, because if end users are not confused, it would be unlikely that the more sophisticated distributors would be confused." (Poret Report 22.) McCarthy agrees, stating that "[s]ince dealers are usually more difficult to confuse by similar marks, while evidence of confusion of dealers should tend to prove confusion of consumers, evidence of non-confusion among dealers would not necessarily prove consumer non-confusion." McCarthy, *supra*, § 32:161. Marketquest believes this ignores the angle of its argument, that is, that end consumers never had the chance to be confused because distributors upstream in the supply chain were confused due to

knowledge of BIC's reputation as a "brand aggregator." (Marketquest's Mot. 13:9-15.) According to Marketquest, BIC has a reputation within the industry of acquiring small suppliers and featuring them as "sub-brands" on the front covers of their annual catalogs. (*Id.* 13:17-14:2.) Such knowledge of BIC's reputation as a "brand aggregator" might make distributors *more likely* to be confused than end consumers. Thus, Marketquest contends, a survey disproving end consumer confusion not only fails to survey either parties' actual customers, but also evades distributors' industry knowledge, thereby making an impermissibly large analytical gap between what the survey proves (likelihood of end consumer confusion) and what it is proffered to prove (likelihood of distributor confusion). (*Id.* 15:1-15.)

In the Court's estimation, the failure to include distributors reduces the survey's probative value, but not so completely as to vitiate its relevance altogether. Although Marketquest may not sell directly to end consumers, it directly promotes its mark and products to end consumers through its websites, online catalogs, and catalogs that distributors show to customers to facilitate their orders. (*See* Opp'n 11:5-14:5.) Marketquest itself admits distributors "were one of two groups of potential customers who could be exposed to catalogs of customizable promotional products." (Marketquest's Mot. 8:15-18.) A universe comprised solely of end customers retains relevancy in this context because, at least to some degree, Marketquest promotes itself to end consumers and end consumers are routinely exposed to the marks and products when considering purchases. Ultimately, end consumers decide what Marketquest products to purchase; that they do so through intermediaries does not render their perception of the products and marks irrelevant.

Marketquest certainly has an argument that in a reverse confusion case such as this, end consumers may be less likely than distributors with a previous understanding of BIC as a "brand aggregator" to believe Marketquest and BIC are now one and the same. As discussed earlier, a proper survey of the likelihood of confusion in this case should assess whether those familiar with BIC's stronger mark,

and who encounter Marketquest's less well-known mark, affiliate it with BIC's mark. However, such arguments affect the weight of the survey and should be presented to the jury on cross-examination. *See Southland Farms*, 108 F.3d at 1143 n.8 ("Unlike novel scientific theories, a jury should be able to determine whether asserted technical deficiencies undermine a survey's probative value."). Indeed, a jury could very well understand and conclude that end consumers are in fact not familiar with BIC's stronger mark, that distributors would have been, and that such sophisticated industry knowledge makes it more likely that distributors would be confused and consequently afford Mr. Poret's survey little to no weight.

Because the "selection of an inappropriate universe generally affects the weight of the resulting survey data, not its admissibility," McCarthy, *supra*, § 32:162, the Court finds that the universe selected by Mr. Poret, standing alone, is not so flawed as to render the survey evidence inadmissible.

**B.     Replication of Market Conditions**

Marketquest makes three arguments that Mr. Poret's survey did not adequately replicate the way customers encounter and perceive either party's marks in the actual marketplace: (i) respondents were shown static screenshots of Marketquest's website, (ii) Mr. Poret does not know whether end consumers search supplier websites, and (iii) showing Marketquest's website and then BIC's and other catalogs improperly enhanced the distinctions between the stimuli. (Marketquest's Mot. 16:2-19:25.)

The Court notes that no survey is perfect: by necessity they are imperfect reflections of how customers act in reality. Surveys are evidence, as opposed to proof, in the sense that they only provide information about a controlled and artificial world from which one can draw inferences about the real world. *See* Harvey S. Perlman, *The Restatement of the Law of Unfair Competition: A Work in Progress*, 80 Trademark Rep. 461, 472 (1990). In other words, helpful inferences might be drawn from a survey questioning randomly selected shoppers at a mall about pictures of two

products, but it would go too far to claim their responses are direct proof of actual consumers as they make purchasing decisions. *Id.* The appropriate approach is to view such evidence with an understanding of the difficulty of developing and implementing a survey and to use any technical defects only to lessen evidentiary weight, not to reject the results out-of-hand. McCarthy, *supra*, § 32:178; *see Clicks Billiards*, 251 F.3d at 1263.

In light of this approach, the Court finds Mr. Poret's survey sufficiently replicates market conditions for admission purposes. As explained earlier, Mr. Poret conducted a Sequential Lineup Survey wherein end purchasers were called on the phone and asked to look at materials on their computer screen while they were being interviewed. (Poret Report 3.) Respondents were first shown static screenshots of the Marketquest website, then parts of four catalogs offering customizable promotional products, one of which was the 2011 Norwood Catalog. (*Id.*) They were then asked if they connected any of the catalogs to the Marketquest website and, if so, why. (*Id.* 4.) Thus, the respondents were shown numerous uses of Marketquest's mark and had ample opportunity to connect the similar mark used on the BIC catalog to Marketquest.

The defects pointed out by Marketquest, if defects at all, are technical and merely lessen the survey's evidentiary weight. A survey using static webpages allows for a carefully controlled procedure in which all respondents receive a standardized exposure to the mark at issue. The ability to freely browse the live site was not so essential in this case as to override the need for a controlled test.

Marketquest's second argument is similarly unavailing. BIC has provided numerous examples in which Marketquest's website appears to speak directly to end consumers. (*See* Opp'n 11:5-14:5.) That the website informs end consumers they should contact "your distributor" does not mean that end consumers are not availing themselves of the website; in fact, it suggests just the opposite. (*See id.* 12:10-13.)

Marketquest's final argument is that showing Marketquest's website and then

BIC's and other's catalogs only enhanced the differences between the stimuli. As evidence, Marketquest highlights a respondent's explanation for why he believed a catalog was from Marketquest's website:

> Well, I'm not sure if I understand the question (I repeated it verbatim to help him).Well, my initial thought is that since this is obviously a scanned in cover, this wasn't the same company because online companies are online and catalog companies are catalog. But aside from that I would say they are the same company.

(Marketquest's Mot. 19:11-19.) Such an argument cuts both ways, however. While it does suggest that perhaps using a website followed by catalogs may have created an artificial distinction between "online companies" and "catalog companies," it also highlights McCarthy's opinion that "[s]ometimes, the most illuminating and probative parts of a survey are not the numbers and percentages generated by the responses, but the verbatim accounts of the responses." McCarthy, *supra*, § 32:178. With the understanding that surveys are clarifying evidence, rather than proof, verbatim responses such as this provide a nuanced view into end consumer thought processes the jury might otherwise not have. Thus, Marketquest's final, double-edged attack neatly encapsulates why professionally conducted surveys should usually be found sufficiently reliable and admissible under the gatekeeping test of *Daubert*: generally speaking, even flawed surveys can and do clarify the issues in a case.

Based on the foregoing, the Court finds neither the survey's universe of respondents nor its replication of market conditions, standing alone or in conjunction, sufficiently flawed to permit exclusion.

## IV. CONCLUSION & ORDER

The Court **DENIES** Plaintiff's *Daubert* Motion to Exclude the Survey and Testimony of Hal Poret. (ECF No. 199.) The survey and testimony are relevant and offered with sufficient foundation by one qualified to give it.

**IT IS SO ORDERED.**

**DATED: April 12, 2018**

Hon. Cynthia Bashant
United States District Judge